123 N.J. Super. 213 (1973)
302 A.2d 163
WILLIAM J. BULMAN, PLAINTIFF,
v.
JOSEPH M. McCRANE, JR., TREASURER, STATE OF NEW JERSEY; WALTER T. PETERS, JR., DIRECTOR, DIVISION OF BUILDING AND CONSTRUCTION, DEPARTMENT OF THE TREASURY, STATE OF NEW JERSEY; AND JAMES A. O'CONNOR, DIRECTOR, DIVISION OF PURCHASE AND PROPERTY, DEPARTMENT OF THE TREASURY, STATE OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided March 7, 1973.
*215 Mr. Kenneth L. Estabrook for plaintiff (Messrs. Lindabury, McCormick & Estabrook, attorneys; Mr. Richard R. Width and Mr. Peter A. Somers, on the brief).
Mr. Morton I. Greenberg, Assistant Attorney General, for defendants (Mr. George F. Kugler, Jr., Attorney General of New Jersey, attorney; Mr. Alan B. Rothstein, Deputy Attorney General, on the brief).
SEIDMAN, J.S.C.
This is a taxpayer's suit to enjoin defendants from entering into a preliminary contract and lease, with option to purchase, for a building to be constructed on state-owned property. The litigation raises complex and difficult issues which, in the factual context here present, have not been fully resolved by our appellate courts.
Put concisely, the problem presented is whether a lease-purchase arrangement whereby a state agency contracts with a builder to erect a facility on state-owned land and lease the same to the State for a term of years at stipulated annual rentals, with an option to purchase at intervals during the term, title to revert to the State at the expiration thereof, violates the debt limitation clause of the State Constitution.
Plaintiff obtained an order directing defendants to show cause why a preliminary injunction should not issue, and defendants countered with a motion for summary judgment. *216 The court denied the latter motion and granted the application for the preliminary injunction. At the State's request, the court heard further argument on the issuance of a preliminary injunction, during which both sides agreed to have the court adjudicate the issues on the basis of the pleadings, affidavits and exhibits on file, without proceeding to trial.
The basic facts are not in substantial dispute. The State owns a parcel of land in Ewing Township upon which it intends to have constructed a building to be used as a records storage center and printing facility. Through the Division of Building and Construction in the Department of the Treasury it solicited proposals for an agreement of lease, with option to purchase, for a building containing about 60,000 square feet of net usable space, to be designed and constructed by a responsible, qualified "builder-developer," in accordance with plans and specifications prepared by the Division's architect and designated as "performance specifications."
Prospective bidders were advised to base their proposals on private financing, since no progress or other advance payments would be made available. The proposals were to contain, among other things, a fixed annual rental figure as well as lump sum selling prices should the State elect to exercise its option to purchase the building at the intervals set forth in the lease. The successful bidder would be required to enter into a preliminary contract, to be executed by the Director of the Division of Building and Construction, obligating the builder-developer to construct the building and thereafter lease it to the State.
The proposed lease, to be executed by the Director of the Division of Purchase and Property, was to be for a term of 25 years, commencing on the date of the State's acceptance of the building, at an annual rental charge payable in equal monthly installments. Included was an option whereby, at any time during the 10th, 15th or 20th year of the lease, the lessee could purchase the lessor's right, title and interest in and to the demised premises for stipulated fixed prices. *217 There was a further provision that "[i]n the event of the failure by the Lessee to exercise any of these options, then and in that event all of the Lessor's title in and to the demised premises shall revert to the Lessee upon the expiration of the term of the within lease."
After the receipt and review of bids, the Director of the Division of Purchase and Property issued a letter of commitment accepting, subject to "Legislative and Executive approval," the proposal of the lowest qualified bidder, Lewis C. Bowers and Sons, Inc., to lease the building to be constructed, at an annual rental of $145,763, based upon a square-foot rate of $2.69 for 54,187 square feet, with an option to the State to purchase the building for $866,000 during the 10th year of the term, $669,000 during the 15th year, and $392,000 during the 20th year.
Because of the institution of this suit, nothing further took place. Plaintiff challenges the validity of the plan devised by the State. He contends, in essence, that the aggregate of the rentals to be paid under the agreement constitutes a debt or liability exceeding the debt limitation provision of the State Constitution; that the lease with option to purchase is in reality a purchase agreement; that the Division of Purchase and Property is without authority to enter into the proposed agreement, and that a public building is being constructed in derogation of the public bidding law.
In response the State argues that the debt, if it is one, will not exceed the constitutional limitation; that, in any event, no debt or liability will be created within the meaning of the constitutional provision, and that, since a lease is involved, there is no violation of the bidding law.
At the core of the controversy is the debt limitation clause in N.J. Const. (1947), Art. VIII, § II, par. 3, the pertinent provisions of which are these:
The Legislature shall not, in any manner, create in any fiscal year a debt or debts, liability or liabilities of the State, which together with any previous debts or liabilities shall exceed at any time *218 one percentum of the total amount appropriated by the general appropriation law for that fiscal year, unless the same shall be authorized by a law for some single object or work distinctly specified therein. Regardless of any limitation relating to taxation in this Constitution, such law shall provide the ways and means, exclusive of loans, to pay the interest of such debt or liability as it falls due, and also to pay and discharge the principal thereof within thirty-five years from the time it is contracted; and the law shall not be repealed until such debt or liability and the interest thereon are fully paid and discharged. No such law shall take effect until it shall have been submitted to the people at a general election and approved by a majority of the legally qualified voters of the State voting thereon. * * *
Over the years the need of government to provide facilities for the burgeoning demands of the citizenry has come into conflict with restrictive and often cumbersome statutory or constitutional provisions limiting the creation of debts or liabilities. On the one hand, there is public pressure for projects requiring long-term financing; on the other, there is the necessity for responsible fiscal management. The result has been the development of plans intended to achieve the desired goals without offending the debt limitation provisions. With particular reference to buildings required for the housing of governmental departments and agencies, two methods have been employed frequently. One involves the creation by the Legislature of public building authorities or commissions empowered to issue bonds, construct facilities, and lease them to governmental units. The other is the lease-purchase contract. Morris, "Evading Debt Limitations with Public Building Authorities: The Costly Subversion of State Constitutions," 68 Yale L.J. 234 (1958); Rogers, "Municipal Debt Restrictions and Lease-Purchase Financing," 49 A.B.A.J. 49 (1952). It is the lease-purchase contract which is involved herein.
Lease-purchase contracts have engaged the courts throughout the country for many years, with results that, even today, have been far from uniform. Fundamentally, the concern is whether such contracts create a debt or liability *219 which is prohibited unless incurred in accordance with the procedures set forth in the applicable debt limitation provisions. Because of variations in the plans, as well as differences in the types of debt limitations involved, the extracting of specifically applicable principles of law is difficult. In addition, sympathetic courts have, on occasion, ruled favorably on the plan under consideration by a somewhat strained construction or interpretation of the facts and the law. A widely accepted test for determining the validity of a lease-purchase contract is the one set forth in the case of City of Los Angeles v. Offner, 19 Cal.2d 483, 122 P.2d 14 (Sup. Ct. 1942):
It has been held generally in the numerous cases that have come before this court involving leases and agreements containing options to purchase that if the lease or other agreement is entered into in good faith and creates no immediate indebtedness for the aggregate installments therein provided for but, on the contrary, confines liability to each installment as it falls due and each year's payment is for the consideration actually furnished that year, no violence is done to the constitutional provision. [citing cases] * * *. If, however, the instrument creates a full and complete liability upon its execution, or if its designation as a "lease" is a subterfuge and it is actually a conditional sales contract in which the "rentals" are installment payments on the purchase price for the aggregate of which an immediate and present indebtedness or liability exceeding the constitutional limitation arises against the public entity, the contract is void.
See also Annotation, "Lease of property by municipality or other political subdivision, with option to purchase same, as evasion of constitutional or statutory limitation of indebtedness," 71 A.L.R. 1318, 1326 (1931), supplemented 145 A.L.R. 1362 (1943).
The use of lease-financing to evade debt restrictions has been criticized by writers on the subject, and it has been observed that the courts have had difficulty in applying the test of City of Los Angeles v. Offner, supra, with any degree of consistency. See Rogers, "Municipal Debt Restrictions and Lease-Purchase Financing," supra; Magnusson, "Lease-Financing by Municipal Corporations as a Way around Debt *220 Limitations," 25 Geo. Wash. L. Rev. 377 (1957); Bowman, "The Anachronism Called Debt Limitation," 51 Iowa L. Rev. 863 (1967); Lillich, "Lease-Purchase Agreements by New York Municipalities," 34 N.Y. State B.J. 459 (1962). In a large number of cases in which leases to governmental bodies have been upheld, the courts have found some reason, not always sound or realistic, for declaring the instrument under review to be a bona fide lease. Bowman, op. cit., supra, comments that the "rapidly growing volume of court cases offers a bewildering array of judicial rulings on the concepts and issues involved in these various approaches to the avoidance of debt limitations."
A proper analysis of the problems presented herein requires, first, a consideration of whether the state agency concerned has the authority to lease or purchase real property. If it has, then one must examine the arrangement to determine whether it is a lease, or lease with an option to purchase, or whether it is an installment contract of purchase. The ultimate inquiry is whether the debt or liability created thereby, if any, exceeds the permissible debt limit.
If the transaction now before the court is a bona fide lease not in contravention of the constitutional debt limitation, there is no question of the competence of the Division of Purchase and Property to enter into it. The Division[1] is empowered to "lease from time to time such office space as may be required for the conduct of the state's business at such terms and under such conditions as it may deem *221 appropriate." N.J.S.A. 52:20-7. It may also maintain and operate warehouses and other storage places. N.J.S.A. 52:25-13. A purchase, contract or agreement may, with the written approval of the State Treasurer, be made, negotiated or awarded by the Director of the Division of Purchase and Property without advertising, when the subject matter consists of "the lease of such office space, office machinery, specialized equipment, buildings or real property as may be required for the conduct of the State's business." N.J.S.A. 52:34-8, 52:34-9(c).
By implication, if not expressly, the Division also has authority to purchase real property. The Director may, with the written approval of the State Treasurer, make, negotiate or award, without advertising for bids, any purchase, contract or agreement, when the subject matter thereof consists of "the acquisition of any real property by gift, grant, purchase or any lawful manner in the name of and for the use of the State for the purpose of the administration of the State's business." N.J.S.A. 52:34-9(d). The significant limitation, however, is that such acquisition must be "in accordance with appropriations made therefor when moneys are required for the acquisition." Id.
The document, called an "Agreement of Lease with Option to Purchase," is substantially in the form of a standard lease and purports to demise to the lessee for a term of 25 years the designated number of square feet of office, records storage, printing and related space, "in a new building which has been constructed by the lessor in accordance with plans and specifications heretofore prepared by the Lessee and approved by both Lessor and Lessee." The annual rental is calculated on the basis of the square feet of space within the exterior walls. Boiler rooms and machine rooms for heating and air conditioning equipment are excluded from the rentable areas.
The lessee is obligated to maintain the demised premises, except for damage by fire, the elements, or other causes beyond its control, and to provide heat, power and light. It *222 is the lessor's responsibility to make all structural repairs. In the case of damage or destruction by fire, rent is suspended until the structure is restored by the lessor, but if the time for restoration will exceed six months, the lessee has the option of terminating the lease upon written notice.
In the event a mortgage is placed on the premises, the lease is subordinated thereto, with the proviso that the lease cannot be terminated so long as the lessee is not in default.
Provision is made for the upward or downward adjustment of the rent in case of increases or decreases in realty taxes on the demised premises.
It is noteworthy that, aside from a standard quiet enjoyment clause, there is no provision reserving to the lessor the right of termination and reentry in the event of default. The lease merely stipulates that should the lessee default in the performance of any of the terms of the agreement, and fail to cure the same after notice, the lessor may do so at the cost and expense of the lessee, to be paid following the submission of a voucher therefor.
As stated earlier herein, the lessee has the option to purchase the lessor's right, title and interest in the demised premises at stipulated fixed prices during the 10th, 15th, or 20th year of the lease, but if the options are not exercised, then all of the lessor's right, title and interest reverts to the lessee upon the expiration of the term of the lease without further payment.
The form of the instrument is not conclusive in determining whether it is a lease or a contract of purchase, or whether it will violate the debt limitation clause; and this is particularly so where, as here, the structure is to be erected on state-owned land and leased to the State at an annual "rental" with title to revert to the State automatically and at no additional cost at the end of the term, unless the State, in the exercise of its option, has purchased the structure earlier.
If the instrument here in question is in fact a lease and the rentals are intended as rentals, no indebtedness *223 would result within the meaning of the constitutional limitation. This is so because, as stated in Clayton v. Kervick, 52 N.J. 138 (1968), and supported by the weight of authority elsewhere, the aggregate amount of future rent is not an immediate debt or liability. See Doland v. Clark, 143 Cal. 176, 76 P. 958 (Sup. Ct. 1904); Vandegrift v. Riley, 16 P.2d 734 (Cal. Sup. Ct. 1932); Krenwinkle v. Los Angeles, 4 Cal.2d 611, 51 P.2d 1098 (Sup. Ct. 1935); Heberer v. Board of Com'rs of Chaffee County, 88 Colo. 159, 293 P. 349 (Sup. Ct. 1930); South Bend v. Reynolds, 155 Ind. 70, 57 N.E. 706 (Sup. Ct. 1900); Jefferson School Tp. v. Jefferson Tp. School Building Co., 212 Ind. 542, 10 N.E.2d 608 (Sup. Ct. 1937); Protsman v. Jefferson-Craig Consol. School Corp., 231 Ind. 527, 109 N.E. 2d 889 (Sup. Ct. 1953); Teperich v. North Judson-San Pierre H.S. Bldg. Corp., 275 N.E.2d 814 (Ind. Sup. Ct. 1971); Hall v. Baltimore, 252 Md. 416, 250 A.2d 233 (Md. Ct. App. 1969); Ambrozich v. Eveleth, 200 Minn. 473, 274 N.W. 635 (Sup. Ct. 1937); Giles v. Dennison, 15 Okl. 55, 78 P. 174 (Sup. Ct. 1904); Kelley v. Earle, 325 Pa. 337, 190 A. 140 (Sup. Ct. 1937); Blair v. Layton City Corp., 6 Utah 2d 138, 307 P.2d 895 (Sup. Ct. 1957); Stedman v. Berlin, 97 Wis. 505, 73 N.W. 57 (Sup. Ct. 1897); State ex rel. Thomson v. Giessel, 267 Wis. 331, 65 N.W.2d 529 (Sup. Ct. 1954). But see People v. Public Building Commission of Chicago, 11 Ill.2d 125, 142 N.E.2d 67 (Sup. Ct. 1957); Davis v. Board of Education of Newport, 260 Ky. 294, 83 S.W.2d 34 (Ct. App. 1935); Brewster v. Deschutes County, 137 Or. 100, 1 P.2d 24, 607 (Sup. Ct. 1931).
Generally, the inclusion in a lease of a simple option to purchase the property creates no present debt or liability, since there is no obligation to pay out funds unless and until the option is exercised. Dean v. Kuchel, 35 Cal.2d 444, 218 P. 2d 521 (Sup. Ct. 1950); Corhran v. Mayor and Council of Middletown, 14 Del. Ch. 295, 125 A. 459 (Del. Ch. 1924); City of South Bend v. Reynolds, supra; Jefferson School Tp. v. Jefferson Tp. Building Co., supra; Kirk v. Union *224 Graded School District No. 1, 180 Okl. 198, 68 P.2d 769 (Sup. Ct. 1937); Stedman v. Berlin, supra. However, it is in those instances where a structure is to be erected and then leased to a governmental entity-lessee, with an option to purchase, that one finds a lack of uniformity and consistency in the reported cases; and a review of those cases can do no more than suggest the circumstances in which the arrangement will be upheld as a bona fide lease which does not infringe upon debt restrictions, and those in which the arrangement is to be struck down as a purchase contract creating an invalid immediate debt or liability.
A pertinent comment appears in State v. Yelle, 47 Wash.2d 705, 289 P.2d 355 (Sup. Ct. 1955):
The state may contract to lease property from private corporations or individuals if the obligations can be met out of current revenues. If it is good business to enter into a long-term lease, it may do so. Likewise, it may enter into a long-term lease with a "body politic and corporate," provided rentals can be paid, when due, from current appropriations. Our problem is to determine whether this plan is a leasing arrangement, or whether it is the acquisition by purchase of capital improvements, for which the state cannot now pay and payment for which is therefore to be made in annual installments extended over a period of thirty years.
It has been said that the lease arrangement which has the best chance of being sustained under debt limitation provisions is one where the rentals are reasonable compensation for use, the option to purchase is truly noncompulsory, and the amount at which the option is to be exercised is approximately the reasonable value of the property, but where the property is to pass automatically to the governmental body at the end of the term, the arrangement is almost certainly a purchase contract and a debt. 2 Antieau, Municipal Corporation Law (1971 ed.), § 15.34 at 427. See also Comment, "Municipal Debt Limitations in Pennsylvania," 15 Vill. L. Rev. 612 (1970).
This is essentially the rationale, as well, of Hall v. Baltimore, supra, which involved the publishing by the city of *225 a request for bids on a lease and leaseback arrangement under which the successful bidder would construct a one-story warehouse on land owned by the city and to be rented to the bidder at a nominal rent, the completed structure to be subleased back to the city at a yearly rent to be submitted with the bid. Forms of the lease and sublease accompanied the request for bids. The successful bidder proposed to erect the warehouse and accept an annual rent of $96,000 for 15 years. The proposed leases contained an option entitling the city to purchase the leasehold at any time after the first six months at an appraised value of the premises and appurtenances. If the option was not exercised by the end of the term, the lessor had to remove the building and restore the land. A taxpayer sought to enjoin the arrangement, claiming it was an unconstitutional creation of a debt without legislative authorization and referendum approval. The court affirmed the holding below that the transaction was a bona fide lease at a fair and reasonable rental and was not, because of the option, a disguised purchase contract. It said:
We come then to the question whether the option given the City to purchase the property during the term of the lease changes the bona fide valid lease into an agreement to purchase the warehouse, which constitutes a debt and thereby violates the constitutional restriction. We think it clear that the option to purchase has no such effect. The rentals are fair and reasonable compensation for the occupancy and use of the warehouse, no part of the rent is to be applied to or credited on the purchase price * * * the option is completely and truly non-compulsory, and the purchase price is to be determined by appraisal of real value at the time of the exercise of the option. * * *

* * * * * * * *
The rationale of the cases upholding a lease of real estate containing a true option to purchase as a lease is that of the Uniform Commercial Code, Code (1964 Repl. Vol.), Art. 95B, § 1-201 (37), in its tests of whether an instrument is a lease or a security instrument, the primary test being the intent of the parties revealed by the facts of each case with these guides and standards:
"however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee *226 shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security."
In Book v. State Office Building Comm'n, 238 Ind. 120, 149 N.E.2d 273 (Sup. Ct. 1958) the court, while recognizing the majority rule that a contract is one of purchase rather than a lease if the so-called rentals are sufficient, if paid throughout the term of the lease, to cover the entire purchase price, held, nevertheless, that the rule was not applicable to the facts before it, inasmuch as the proposed leases were for an indefinite term with a right of cancellation. Thus, said the court, the rentals could not be considered as sufficient to cover the purchase price of the building. See also Protsman v. Jefferson-Craig Consol. School Corp. and Jefferson School Tp. v. Jefferson Tp. School Building Co., supra, upholding leases granting a school corporation a non-compulsory option to purchase the property at a price equal to the amount required for the liquidation of the building corporation's indebtedness.
The case of Krenwinkle v. Los Angeles, supra, held that where the lease contained an option to purchase the demised premises if all rentals and other charges were paid, and the purchase price did not decrease with the amount of rent paid, and the rentals could not be applied on the purchase price, the lease was bona fide.
Obviously, if title is not to pass to the lessee, the instrument is a lease and cannot be construed as a contract of purchase, even though there is involved a legislatively created authority or commission empowered to construct buildings and lease the same to state agencies. Kelley v. Earle, supra; Greenhalgh v. Woolworth, 361 Pa. 543, 64 A.2d 659 (Sup. Ct. 1949); State ex rel. Thompson v. Giessel, 271 Wis. 15, 72 N.W.2d 577 (Sup. Ct. 1955); Petition of Board of Public Buildings, 363 S.W.2d 598 (Mo. Sup. Ct. 1963).
Where a transaction has been held to be a contract of purchase rather than a lease, it is usually because the rentals *227 are so calculated as to constitute actually the cost of construction; or, in the case of an option to purchase, credit is given for rents paid; or, at the expiration of the lease, ownership is acquired by the lessee either at no additional cost or for a nominal consideration. The following cases are illustrative.
City of Phoenix v. Phoenix Civic Aud. & Con. Cent. Ass'n, 99 Ariz. 270, 408 P.2d 818 (Sup. Ct. 1965), involved an agreement whereby the city was to condemn land and lease it to a nonprofit association which would lease both to the city for 35 years the land and the auditorium to be constructed thereon, the city to pay a monthly rental from its general funds. At the end of the 35-year period the city was to receive the property. Although the proposed lease provided for reentry and recovery of possession in the event of default, and the monthly rental was stated to be for and in consideration of use and occupancy, the court, nevertheless, held the contract to be nothing more than a purchase agreement creating a debt which would exceed the constitutional debt limit. It noted that the rentals were fixed at a figure sufficient to pay for the cost of the auditorium, including interest and incidental expenses, payment of which was to come from general taxation.
In Mahoney v. City and County of San Francisco, 201 Cal. 248, 257 P. 49 (Sup. Ct. 1927), the proposed arrangement called for leasing to the city and county for park purposes a tract of land for a term of 10 years at a stipulated annual rental figure. The lease contained an option whereby the lessee could purchase the property at any time for $240,000, with credit to be given for such payments as had been made on account of rent. The court held that the total rent payments were actually equivalent to the purchase price plus interest; consequently, the transaction was, in reality, a contract of purchase with payment to be made in installments.
A similar situation was involved in Baltimore & O.S.W.R. Co. v. People, 200 Ill. 541, 66 N.E. 148 (Sup. Ct. 1902), *228 in which it was proposed to lease an electric light plant to a city for a 13-year term at a yearly rental of $1,000. It appeared that the light company was indebted on its plant in the sum of $13,000. The city was given the right to purchase the plant at any time during the lease for the amount of the debt, with credit given for rent payments already made. The transaction was held to be a contract of purchase.
Where a nonprofit corporation was organized to acquire real estate and construct thereon a civic center, and to lease the same to the city for 25 years, with a proviso that upon dissolution of the corporation all remaining property and assets should vest in the city without consideration, the lease was held to be a transparent purchase and sale of a civic center. Bachtell v. Waterloo, 200 N.W.2d 548 (Iowa Sup. Ct. 1972).
McKinley v. Alamogordo Municipal School Dist. Auth., 81 N.M. 196, 465 P.2d 79 (Sup. Ct. 1970), involved a plan for the erection of a school building by a school district authority and the leasing of the same to the school district at a basic annual rental. The lease contained an option to purchase at a price sufficient to cover the authority's debt. This was held to violate the constitutional debt limit.
The leasing to a village of parcels of land for public parking lots, for a term of 20 years, with an option to purchase for $1 at the end of the term, was held to be nothing more than a purchase of the premises by paying monthly installments for 20 years, since the $1 consideration was no reflection of the reasonable value of the property. Marine Midland Trust Co. v. Waverly, 42 Misc.2d 704, 248 N.Y.S.2d 729 (Sup. Ct. 1963).
A proposal to construct a swimming pool on property to be conveyed by the city and to lease the same to the city for ten years, at a stated rental, with a waiver of the right to reentry for default and title to be acquired by the city at the expiration of the term, was held to be an installment contract which created an invalid present indebtedness. State *229 ex rel. Kitchen v. Christman, 31 Ohio St.2d 64, 285 N.E. 2d 362 (Sup. Ct. 1972).
See also City and County of San Francisco v. Boyle, 195 Cal. 426, 233 P. 965 (Sup. Ct. 1925) (agreement by municipality to acquire land and buildings for public use, though denominated a lease, held to constitute an agreement to purchase, where the ultimate intent was concededly the purchase of the property by the municipality); Deti v. Durango, 136 Colo. 272, 316 P.2d 579 (Sup. Ct. 1957) (leasing of building by city at fixed rental, to be derived from charges for use of building and other sources of revenue, or, if those funds were insufficient, from the city's general funds, held, on dubious reasoning, to violate debt limit); People v. Doyle and Associates, Inc., 374 Mich. 222, 132 N.W.2d 99 (Sup. Ct. 1965) (lease-back agreement between contractor and city providing for construction and equipment of medical facility and the use thereof by the county at monthly specified sums, with title to be in the county at the end of ten years, was held to be a purchase by deferred payments).
Both sides make extended reference to the cases of McCutcheon v. State Building Authority, 13 N.J. 46 (1953); Clayton v. Kervick, 52 N.J. 138 (1968); and Holster v. Bd. of Trustees of Passaic County College, 59 N.J. 60 (1971). Plaintiff argues that McCutcheon supports his thesis that the proposed transaction is an invalid attempt to evade the constitutional debt limit. Defendants claim McCutcheon has been substantially overruled by Clayton and, in any event, is distinguishable from the case at bar. However, the cases have only limited application to the issues involved herein.
McCutcheon dealt with the State Building Authority, empowered to issue bonds, to acquire, construct and operate building facilities, and to lease them only to the State or any of its agencies and departments. The bonds, expressly declared not "[to] be deemed to constitute a debt or liability of the State or of any political subdivision thereof or a *230 pledge of the faith and credit of the State or of any such political subdivision," were to be repayable from rentals, the only income of the Authority. In striking down the statute the court held that the bond issues were sustained by the State's promise to supply, in the guise of rentals, but actually through annual appropriations, sufficient money to liquidate the bonds. It said that since, upon retirement of the bonds, the State could acquire title to the buildings simply by dissolving the Authority, the leases were really contracts of purchase, and the real design of the statute was to enable the State to acquire buildings which it could not have done except in compliance with the debt limitation clause of the Constitution. The entire purchase price, the court concluded, became a liability at the time the leases were entered into, thus violating the debt limitation clause.
Justice Jacobs, joined by Justice Brennan, dissented. He argued that, inasmuch as the bonds were expressly stated not to constitute a debt or liability of the State, no burden was assumed with respect to the payment thereof; the only obligation of the State being to pay for the current yearly occupancy, presumably out of an appropriation for that year. The weight of authority, he said, was that future rents are not a present debt or liability; consequently, no immediate liability was created in the aggregate amount of all the future rents, and no violation of the constitutional debt limit resulted.
In Clayton the court upheld a statute creating the Educational Facilities Authority for the purpose of constructing projects and leasing them to participating educational institutions. The Authority was authorized to issue bonds, not to be deemed a debt or liability of the State, payable from annual rentals on the leases. Justice Jacobs now spoke for the majority of the court. After noting once more that future rents were not recognized as present debts or liabilities, and observing that in other jurisdictions statutes have been sustained establishing independent authorities to construct public buildings and lease them to state agencies, he specifically *231 distinguished the building authority involved in McCutcheon, in that it could lease its buildings only to designated state agencies whose rental payments would come entirely from legislative appropriations, whereas, in the case of the Educational Facilities Authority, the rentals were to come mainly from sources other than such appropriations. Thus, the debt limitation clause was not violated.
Although McCutcheon was not expressly overruled, it was, as noted by Justice Hall in his concurring remarks, 52 N.J. at 158, whittled down so that substantially nothing was left.
The last of the trilogy, Holster, did not involve either an authority created by statute or a lease. It held that where counties issued bonds under the County College Bond Act, to be devoted to making up the State's share of the cost of capital outlays for county colleges, which bonds were not to constitute a debt or liability of the State or a pledge of the State's faith and credit, but the payment of which were to be met by state appropriations, the bonds did not become the obligation of the State, but only of the issuing counties. Since the statute did not impose a legally enforceable obligation upon the State either to pay the bonds or to reimburse the counties therefor, the debt limitation provision of the Constitution was not infringed.
It is evident that these cases do not squarely resolve the issues in the litigation now before the court. The common element in all of them is the issuance of bonds expressly declared by the authorizing statute not to constitute debts or liabilities of the State. Clayton stands for the proposition, not relevant here, that where such bonds, issued by a legislatively created authority, are to be paid from moneys received mainly from sources other than legislative appropriations, no obligation is assumed by the State which contravenes the debt limitation clause of the Constitution. The significance of Holster is chiefly that even though such bonds, issued by a subdivision of the State, are to be paid out of state appropriations, there is no binding or enforceable obligation on the part of the State to do so.
*232 In view of Clayton, very little is left of McCutcheon. The conclusion that rentals falling due in future years should be regarded as present debts or liabilities is no longer tenable. What is left, however, may have some bearing on the issues involved herein. Neither McCutcheon nor Clayton deals with a lease-purchase type of arrangement not involving a legislatively created authority. In McCutcheon, as here, the proposed lease was to be to the State or one of its agencies, and the rentals were to come solely from state appropriations. Clayton does not resolve the issue of whether, in such case, the debt limitation clause is violated. In his concurring opinion Justice Hall thought that it did:
* * * I believe the case [Mc Cutcheon] still ought to remain as sound law to the extent of its general holding that the debt limitation provision is violated (assuming the amount involved is sufficient) where the revenue to pay for state governmental (or for that matter, educational) buildings furnished through an authority, and thus to satisfy that authority's obligations, must and will come, in reality, only from state appropriations. The interposition of a so-called autonomous agency between the Legislature and the state agency or department benefited in such a situation is to me, realistically, only doing indirectly by means of a conduit what may not validly be done directly, absent referendum approval.
If it is felt we can no longer live with the debt limitation and public aid project provisions of the 1947 Constitution, they ought to be amended by the prescribed method rather than through legislative nullification or evasion and judicial sanction thereof. [52 N.J. at 158-159]
In instances where bonds are issued by legislatively created authorities to pay for the cost of construction of buildings to be leased to governmental or quasi-public bodies, and the only income of the authority is rentals paid solely out of state appropriations, Justice Hall's views are supported by cases in other jurisdictions. People v. Green, 382 Ill. 577, 47 N.E. 2d 465 (Sup. Ct. 1943); State ex rel. Nevada Bldg. Authority v. Hancock, 86 Nev. 310, 468 P.2d 333 (Sup. Ct. 1970); McKinley v. Alamogordo Municipal School Dist. Auth., supra; State Office Bldg. Commission v. Trujillo, 46 N.M. 29, 120 P.2d 434 (Sup. Ct. 1942); *233 State v. Yelle, 47 Wash.2d 705, 289 P.2d 355 (Sup. Ct. 1955). Where, however, the rentals are substantially paid from sources other than appropriations, and are thus self-liquidating, the principles set forth in Clayton prevail. Book v. State Office Building Comm'n, supra.
The problems presented by McCutcheon, Clayton, and other cases involving the payment of bonds issued by autonomous bodies arise out of situations different from the one now under consideration. Here there is no intervening, legislatively created authority. The arrangement is directly between a state agency and a private builder-lessor. The State is the proposed lessee and the rentals will necessarily come only from legislative appropriations. Whether, in such case, Justice Hall's caveat applies has not been resolved.
Nevertheless, taking into account the principles which can be gleaned from the cases cited and discussed hereinabove, the court is convinced that the arrangement in this case is an installment contract of purchase and not a lease, and that it violates the debt limitation provisions of the Constitution. Because of factual variations, as well as differences in debt limitation provisions, one is unable to point to a case on all fours; nonetheless, a careful examination of the proposed lease reveals its deficiencies.
One or more elements of the lease, standing alone, could be consistent with a bona fide instrument; taken as a whole, they are not. For instance, the lease contains a basic annual rental, subject to adjustment should taxes increase or decrease. If that were the only factor to be considered, the rental, by itself, might be deemed to be reasonable compensation for the use of the structure; at least, there is no evidence to the contrary. However, as one looks at other provisions, a different picture emerges.
It is significant that the State retains ownership of the land on which the proposed facility is to be erected by the so-called "builder-developer," unlike the arrangement in many of the cited cases, by which the structure is constructed either on the builder's own land or on land leased to it by the governmental *234 body, and then, along with the land, is leased back. There would be an incongruous result if, at the expiration or earlier termination of the lease, the builder-developer should own a building on land title to which was in the State.
There is a purported noncompulsory option to purchase. But if the option is not exercised, title reverts to the State in any event at the expiration of the lease, without additional compensation. Actually, therefore, the option is not one whereby the lessee has the choice of either purchasing or surrendering the premises at the end of the term. It is merely a provision for accelerating the acquisition of title by the payment of stipulated amounts.
The State's ownership of the land, coupled with the fact that it will automatically own the building at the expiration of the term, unless the option is exercised earlier, is more consistent with a design to acquire the structure rather than to lease it.
The case of 405 Monroe Co. v. Asbury Park, 40 N.J. 457 (1963), is distinguishable. The complaint in that case sought specific performance (or alternatively damages for its breach) of an agreement whereby plaintiff leased its property to defendant municipality for a term of 25 years. The property consisted of a ramp garage, erected in the mid-1920's, which the owners offered to the city. Needing a jail, municipal court facilities, police headquarters and parking space, the city negotiated a lease with the plaintiff corporation, and the instrument was signed on December 31, 1956.
To effect the required alterations, plans and specifications were prepared by the combined efforts of both parties, each selecting an architect, and the two so selected choosing a third. The total cash outlay by plaintiff was in excess of $264,000. On March 25, 1958 plaintiff tendered the completed structure to the city; however, by that time a new administration had taken office, and the city refused to accept it. The answer filed by the city alleged, among *235 other things, that the agreement was a legal subterfuge in that it was an installment contract of purchase which would exceed the debt limitation of the city, contrary to the provisions of the Constitution.
In reversing the judgment below in favor of defendant, the trial court having ruled that certain statutory requisites had not been met, the court held, first, that where the difficulty is an irregularity in the exercise of a power the municipality does have and the Legislature has not decreed the consequences of the irregularity, a just result must be sought, and one who deals with the municipality in good faith may be permitted to invoke the concept of ratification. With respect to the contention that the transaction was an installment sale rather than a lease, the court pointed out that the constitutional provision was not pertinent, since it applied only to the State. It also held that the agreement did not clash with certain statutes cited by plaintiff, and that the parties "could and did deem the agreement to be a lease and should be barred from disputing its nature at this late date."
The agreement in the cited case called for the payment of net rental and contained other provisions consistent with conventional long-term leases. It also contained a provision that the city would receive title upon paying $1 at the end of the 25-year term. On this point the court held as follows:
* * * The trial court held the city had to accept title and had no choice in the matter. We think it is not crucial whether that is so, and for convenience we refer to this provision as creating an option. The city argues that the option price of a dollar demonstrates that the periodic payments represent the purchase price, and hence the transaction must be a sale. Ordinarily that would be so, but not under the peculiar facts of this transaction.
Since a lessor expects to recover out of rent the depreciation in his investment in addition to a return upon that investment, the amount of rent necessarily depends upon the life expectancy of the structure. If the term of a lease equals the expected life of a building, the lessor will seek to recapture its full value within that period. In such circumstances an option to buy the residual value at the *236 end of the term for a small sum is compatible with the concept of a lease.
Here we have a structure which as a ramp garage was quite single in its purpose and with the alterations we have described became uniquely so, since a jail, a courtroom, police headquarters and pistol range are of no general utility. Hence the lessor would expect to recoup his investment during the period of the lease. A realtor testified that after 25 years the structure would be of no value to the owner and the cost of demolition would equal the land value. * * *
In these circumstances the parties could understandably have intended the stipulated periodic payments to constitute rent and nothing else. On the one hand, the lessor, doubtful of any residual value to it of a building altered for those municipal purposes, would insist upon recapturing the investment within the term of the lease, while the lessee, accepting and yielding to the lessor's thesis for fixing rental value, would then expect a terminal option to buy for a nominal sum in the hope that the structure will still be fit to serve the city's special needs. In terms of fiscal integrity, the essence of a lease transaction is that the annual rent shall represent what the parties believe to be the annual value of the use and enjoyment. Two realtors testified the agreed rent represented a fair rent and no expert testified to the contrary. The parties could believe their arrangement was one of lease. [at 455-456; emphasis supplied]
In the above case, aside from the issue of estoppel, there was proof that at the end of the lease term the structure would be of no value to the owner and the cost of demolition would equal the land value. Recognizing the general rule to be that an option to purchase for a nominal amount demonstrates that the periodic rent payments represent the purchase price, the court held the lease to be bona fide under the peculiar facts of the case.
Here, however, the State does not contend that the proposed facility would have no value at the end of 25 years. No details have been given to explain either the computation of the rental amount or the stated purchase price. Undoubtedly, the builder-developer has calculated his cost of construction, including overhead and profit, and has taken into account what will be required to amortize a mortgage loan. It is a reasonable assumption that the amounts to be paid during those years when the option to purchase can be exercised are what will be needed to pay off whatever indebtedness exists at that time.
*237 All of these factors lead to the conclusion that the clear intent of the arrangement is an installment purchase of the storage facility, and not a lease. As such, it creates a debt or liability in violation of the constitution's debt limit provision.
It should be noted that the Attorney General, in the past, has disapproved arrangements substantially similar to the one now before the court. In 1957 the Director of the Division of Purchase and Property inquired concerning his power to secure additional building space by arranging for the erection of certain structures by private contractors either upon state-owned or privately-owned land, payment to be made over a period of time in the form of rentals, with title to the structures (and to the land, where privately owned) to remain in the contractor until the completion of all payments. The Attorney General ruled (Formal Opinion No. 10, 1957) that the proposed transaction was not a true lease, but was in essence tthe installment purchase by the State of a building. The payments, though designated rentals, would not be compensation for the use of the building but would constitute the purchase price. McCutcheon v. State Building Authority, supra, was cited in support.
Even though it is doubtful that McCutcheon, as drastically limited, is in point, the Attorney General's conclusions are in accord with the weight of authority, and there is nothing in Clayton v. Kervick, supra, to the contrary.
The Attorney General's opinion went on to say that authority to contract for the erection of buildings must be found in line items of appropriation acts or in some other statute clearly setting forth the power in question. No funds, however, had been appropriated for the contemplated construction, nor was there any other legislation empowering the Director of the Division of Purchase and Property to act.
*238 In Formal Opinion No. 2, 1959, the Attorney General reaffirmed that a lease-purchase agreement between the State and a private contractor for the construction of buildings to house state agencies would be improper, where title to the property would remain in the contractor until the completion of all rental payments, whereupon it would vest automatically in the State. Such transaction, it was said, would be an installment purchase which violated the debt limitation provision of the Constitution. However, under the agreement being reviewed, the builder would erect a structure to be leased to the State, with an option empowering the State, at given intervals, to purchase the building at a price in accordance with a sliding scale reflecting the depreciated value of the building and the fair market value at the time of purchase. There was no provision for the automatic acquisition of title at the expiration of the lease. This arrangement, the Attorney General ruled, was proper, since the option to purchase was not compulsory, and, if it was exercised, the prior rental payments would not be credited against the purchase price.
In Formal Opinion No. 21, 1961, the Attorney General again stated that lease-purchase agreements, at the conclusion of which the State is vested with title, are not long term rentals but installment purchases.
This court is not bound by the views of the Attorney General, and it recognizes that the opinions all cite McCutcheon. Nevertheless, the State has not shown in what respects the arrangement now before the court substantially differs from the kinds disapproved by the Attorney General, or that post-McCutcheon cases support the proposed transaction.
It is, of course, true that it is never an illegal evasion to accomplish a desired result, lawful in itself, by discovering a legal way to do it. Book v. State Office Bldg. Comm'n, supra; Kelley v. Earle, supra; McFarland v. *239 Barron, 83 S.D. 639, 164 N.W.2d 607 (Sup. Ct. 1969). Unfortunately, the proposed transaction is not the way.
Counsel for defendants contends that even if the total to be paid, should the purchase option not be exercised, is a present debt or liability, the amount, about $3,600,000, does not exceed the constitutional debt limit. The theory advanced is that "[t]he only possible reading of the constitutional provision is to exclude from the calculation of the prior debt or liabilities debt funded by vote of the people under the Constitution itself," and that if this is done, there is no prior debt; consequently, the agreement in question, even if it gives rise to a debt, would not exceed the constitutional debt limit. The contention is without merit since the simple fact is that the State has no present capacity to create debts or liabilities in excess of the amount annually appropriated by the Legislature, unless the constitutional procedure is followed. The present bonded indebtedness of the State exceeds $2,000,000,000, the principal and interest of which, except in the case of dedicated funds, must be paid by appropriations in annual budgets. Counsel's far-fetched notion seems to be that a bonded indebtedness is not the kind of debt contemplated by the Constitution, and that the State can appropriate up to about $20,000,000, or 1% of the current State budget. If th concept were sound, it is unlikely that the financial bonanza envisaged by counsel would have gone unnoticed by those charged with the fiscal affairs of the State.
The Court concludes that the proposed arrangement, on the facts here present, is not a bona fide lease, but is a contract to purchase the storage facility on installments and, as such, violates the debt limitation provisions of the Constitution. Having reached this conclusion, it is unnecessary to consider plaintiff's additional argument that the statute pertaining to bidding has not been observed. N.J.S.A. 52:32-2.
*240 Judgment will be entered restraining the defendants from entering into or executing the preliminary contract and agreement of lease for the construction of the Central Record Storage and Central Printing Facilities Building which is the subject-matter of this lawsuit.
NOTES
[1] The Division of Purchase and Property was established within the Department of the Treasury by L. 1948, c. 92, § 3 (N.J.S.A. 52:18A-3), with all the functions, powers and duties of the Division of Purchase and Property of the former Department of Taxation and Finance. N.J.S.A. 52:18A-16. The latter Division had succeeded to the powers theretofore vested in the State Purchasing Department and the State Purchase Commissioner, N.J.S.A. 52:27B-55, including the maintenance and operation of warehouses and other storage places, N.J.S.A. 52:25-13; and also to some of the powers of the State House Commission, N.J.S.A. 52:27B-64, including the leasing of office space, N.J.S.A. 52:20-7.