[No. 33377.   *En Banc.*   November 4, 1955.]

THE STATE OF WASHINGTON, *on the Relation of the Washington State Building Financing Authority, Plaintiff,* v. CLIFF YELLE, *as State Auditor, Respondent.*[1]

*Paul H. Graves, Special Assistant Attorney General,* for relator.

*The Attorney General* and *Mitchell Doumit, Assistant,* for respondent.

SCHWELLENBACH, J.—The relator applied for a writ of mandate directing Cliff Yelle, as auditor of the state of Washington, to issue and deliver a warrant in the sum of ten dollars in payment of a voucher issued to Lorraine Raymond for services rendered as a stenographer for relator. An alternative writ was issued by the Chief Justice commanding

[1]Reported in 289 P. (2d) 355.

the auditor to forthwith draw the warrant or to show cause why he should not do so.

In his return, the auditor challenged the constitutionality of the act creating the building authority.

Chapter 12, Laws of 1955, Ex. Ses., p. 1754, is a comprehensive plan to finance, construct, and operate needed buildings and facilities for the institutions of higher learning and for the various agencies and departments of the state. It creates "a body corporate and politic" to be known as the state building financing authority, consisting of three members: the Governor, or his representative; the state treasurer; and the director of general administration.

Briefly, the plan is this. The authority is to purchase or lease land from the institutions of higher learning and the various agencies and departments of the state, erect and equip buildings thereon, and then lease them back to the institutions of higher learning and various agencies and departments for terms not to exceed thirty years; at such rentals as it shall determine. The construction is to be financed by the issuance of revenue bonds to mature at a time not to exceed thirty years from their respective dates, and to draw interest at four per cent per annum, which shall be the obligation of the authority alone, and not the obligation of the state or any of its institutions of higher learning, agencies, departments, or instrumentalities.

The authority shall have power to fix, alter, charge, and collect rentals for the use of the buildings and facilities; to provide for the security of the bonds and the rights of the holders thereof (at no time shall it have outstanding more than fifty million dollars in bonds, except temporarily when the money is to be used to refund some or all of the bonds); to borrow money and to accept grants from the United States government or any Federal or state agency, or any other public or private corporation, association, or person; "To pledge or otherwise encumber all or any of the revenues or receipts of the authority as security for all, or any, of the obligations of the authority."

"Any institution of higher learning, or agency or department of government of the state of Washington may, at any

time that sufficient funds are available, negotiate with and purchase from the authority its interest in any structure, equipment, facility or other property owned or otherwise possessed by the authority."

The state treasurer shall transfer to the fund of the authority the amount of rental payments or other charges due and owing to it by any of its lessees from any funds held in the state treasury for the lessee not otherwise restricted by statute or the state constitution, provided the treasurer is furnished evidence that the lessee has consented that such funds may be transferred.

In connection with the above, it is contemplated that the rentals will be paid from funds derived from tuitions, capital grants, and appropriations to the various institutions and agencies.

The bonds shall be a legal investment for all state funds not otherwise restricted by the state constitution, or for funds under state control not otherwise restricted. Before issuing any bonds, the authority shall confer with the state finance committee in order that the bonds may be sold in such manner and in such amounts and on such terms and conditions *as the finance committee deems advisable.*

Section 5 (3) authorizes the authority:

"To acquire, purchase, hold, lease as lessee, and use any property real, personal or mixed, tangible or intangible, or any interest therein, necessary or desirable, for carrying out the purposes of this act, and to sell, lease as lessor, transfer and dispose of any property or any interest therein at any time acquired by it: *Provided, however,* That in any biennium initial contracts of lease shall be entered with institutions of higher learning and agencies and departments of government of the state for only such new buildings as have been specifically authorized by the legislature for that biennium."

Chapter 13, Laws of 1955, Ex. Ses., p. 1770, authorized the authority to finance and construct certain projects at the university, state college, central, eastern, and western colleges of education, state school for the deaf, eastern state hospital, state school for girls, northern state hospital, state

penitentiary, and western state hospital, at a total expenditure of $12,420,100.

The act contains a number of sections pertaining to the rights and remedies of bondholders, even giving them the right, in case of default on the payment of the bonds, to the appointment of a receiver to take possession of the projects, buildings, or facilities, operate and maintain the same, and collect rentals thereon. The state pledges that it will not limit or restrict any provisions for the security and protection of the authority and its bondholders until all bonds at any time issued, together with the interest thereon, are fully paid and discharged.

The act appropriated to the authority the sum of $90,000, or so much thereof as might be necessary, for payment of expenses incurred in the commencement of the work. It is from this fund that the ten dollar warrant involved in this action is requested.

Section 1, Art. VIII, of the state constitution provides:

"The state may to meet casual deficits or failure in revenues, or for expenses not provided for, contract debts, but such debts, direct and contingent, singly or in the aggregate, shall not at any time exceed four hundred thousand dollars ($400,000), and the moneys arising from the loans creating such debts shall be applied to the purpose for which they were obtained or to repay the debts so contracted, and to no other purpose whatever."

We held in *State ex rel. Wash. Toll Bridge Authority v. Yelle*, 195 Wash. 636, 82 P. (2d) 120, that revenue bonds issued by the authority (the payment of neither the principal nor interest thereof to constitute a debt, liability, or obligation of the state) and secured by the tolls and other revenues received from the operation of the particular toll bridge or bridges, did not constitute a general obligation of the state, and therefore did not offend the debt limitation provisions of the constitution. In *Gruen v. State Tax Comm.*, 35 Wn. (2d) 1, 211 P. (2d) 651, we held that bonds issued to pay the veterans' bonus, secured by an excise tax on the sale of cigarettes, for the payment of which the credit of the state was not pledged, did not create a debt within the

meaning of the constitutional debt limitation, since such limitation applies solely to that arising from a general levy and not excise taxes. For similar holdings, see *State ex rel. Capitol Committee v. Clausen,* 134 Wash. 196, 235 Pac. 364, involving payments from revenues derived from the lease and sale of granted lands; and *Ajax v. Gregory,* 177 Wash. 465, 32 P. (2d) 560, involving the liquor revolving fund. It should be pointed out, however, that in none of the above cases was the general tax fund involved.

Respondent frankly admits that a substantial number of building authority acts in various states have been held unconstitutional, but urges that the draftsmen of this act have scrupulously studied all precedents and have drafted the act in the light of their studies.

In *Kelley v. Earle,* 320 Pa. 449, 182 Atl. 501, a general state authority was set up to acquire lands, construct water works, and lease them to the commonwealth at an annual rental calculated to pay operating expenses and amortize bonds. The authority, by resolution, provided that, at the expiration of the term of the lease and upon payment of the rent stipulated, title to the water works would be transferred to the commonwealth, free and clear of all encumbrances. The court held that the plain purpose of the act was to permit the commonwealth to construct public works for which it was not then able to pay and for which it could not directly borrow, and that it was an attempt to evade the constitutional restriction on debt.

A petition to rehear was granted, and in *Kelley v. Earle,* 325 Pa. 337, 190 Atl. 140, the court did somewhat of a right about face. However, additional and different facts were presented at the second hearing. It was pointed out that the Federal authority would furnish, without reimbursement, forty-five per cent of the cost; that the revenues to be derived from operation were practically liquidating; and that, at the end of the rental period, the title and ownership of the property would be in the authority, with no provision for reconveyance to the state. It was held, under these facts, that the transaction was not a purchase of capital assets by installments, that it was not an outright purchase of prop-

erty to be paid for in the future, but that it was a lease and nothing more.

*McCutcheon v. State Building Authority*, 13 N. J. 46, 97 A. (2d) 663, involved the constitutionality of a building authority act which was identical in most respects with the act under consideration. The basic difference was that the authority apparently was to be dissolved when all of the bonds, plus interest, were fully paid. We quote quite fully from the opinion because of the language used therein:

"But the statute under review does not represent an exercise of state power conformably to the cited constitutional limitation. While in form a way of providing the State with leasehold interests in building facilities for public use, in reality the design of the act is to enable the State by contracts of purchase to acquire for state use buildings possessed and constructed by the Authority by means of bond issues sustained by the State's promise to supply in the guise of rentals sufficient money to liquidate the bonds, available only through the medium of annual appropriations. And this in disregard of the constitutional debt limitation and the restraints laid by the organic law upon the appropriation process. There is no pretense of conformance with the debt limitation provision; there was no submission of the project to the electorate under *Article* VIII, *Section* II, *paragraph* 3. The legislation proceeds upon the hypothesis that the fulfillment of the project will not burden the State with a debt or liability within the constitutional sense. But in this the accent is on the external appearance rather than the substance. The label is unimportant; it is not the form but the essence that controls. It is an obvious truism that constitutional limitations may not be set at naught by indirection. . . .

"Thus, the Authority is constituted an instrumentality of the State designed to authorize the construction of building facilities for the use of the State that, if accomplished by the State directly, would be ineffectual as in excess of the constitutional debt limit, absent the referendum approval of the electorate in consonance with the debt-limitation provision. Such is indubitably the nature of the projects undertaken by the resolution of the Authority now under review —a contrivance to accomplish that which by the same means the State could not do directly.

"The property of the Authority becomes the property of the State. The State conceived the Authority to serve what

was deemed to be an essential public need; and the Authority remains subject to control and dissolution by its sovereign creator, save only as restrained by the constitutional immunity of the holders of the bonds and other third parties from the impairment of the obligation of contract. Upon dissolution the Authority's property passes to the State. By this device the purchase price of the property is to be paid by the State, through appropriations made to the particular department, agency, or instrumentality in the exercise of an essential governmental function. While the payments thus made by the State through its governmental agency take the form of 'rentals,' they are in substance and effect the purchase price of the property, for they are to be sufficient in amount to defray the Authority's operating expenses and in the end to liquidate the principal of the bonds and the interest accruing thereon. Were this not so, the Authority would be unable to function, for it would have no other source of revenue adequate to retire the bonds. The Authority may 'lease' only to the state departments, agencies and instrumentalities, and at a 'rental' determined by this standard. These are not leases, as in the case of the Prentice Company, but contracts of purchase by the sovereign for public use; the 'rentals' constitute appropriations made by the State, not alone to provide operating expenses, but in *quantum* sufficient for the ultimate payment and retirement of the bonds. A true lease rental is compensation for the use of the property, not the consideration price for its purchase. . . .

"Here, unlike those that have gone before, the subject of the Authority's domain is not a toll or self-sufficient facility; the Authority is obliged to lease its building facilities to the State or its departments, agencies, or instrumentalities, and the State Treasury is the sole source of its revenue, in the form of legislative appropriations utilized for the payment of an agreed 'rental' in amount adequate to defray the Authority's operating expenses and service and effect the ultimate retirement of the bonds. Thus, the Authority is non-revenue producing; it is an instrumentality of the state whose function is wholly dependent upon state moneys raised by taxation; the leasing device is in essence an installment purchase by the State of office building and personnel-housing facilities. Such a contract with a department or agency of the State would be a contract with the State itself. Of this there can be no doubt."

■ The state may contract to lease property from private corporations or individuals if the obligations can be met out of current revenues. If it is good business to enter into a long term lease, it may do so. Likewise, it may enter into a long term lease with a "body politic and corporate," provided rentals can be paid, when due, from current appropriations. Our problem is to determine whether this plan is a leasing arrangement, or whether it is the acquisition by purchase of capital improvements, for which the state cannot now pay and payment for which is therefore to be made in annual installments extended over a period of thirty years.

Let us examine the situation and see what the plan actually will accomplish. The state is in dire need of housing for its institutions of higher learning and agencies and departments of government. It cannot, because of Art. VIII, § 1, of the state constitution, contract debts sufficient to construct such buildings. To overcome this, it creates the authority, a "body politic and corporate." The authority is given power to borrow money and construct buildings (in the matter now before us) at a total expenditure of $12,420,100. To pay for these buildings, it shall borrow money and issue revenue bonds, payable in thirty years, and shall pledge its revenues, rentals, and receipts as security for the bonds. It shall lease the properties to the state's institutions of higher learning and agencies and departments of government for terms not exceeding thirty years. The rate of rentals must be sufficient to pay the interest on the bonds as it becomes due (no inconsiderable sum), the principal of the bonds as it becomes due, the necessary fiscal agency charges for paying principal and interest, any premium on bonds retired by call or purchase, expenditures necessary to the enforcement of remedies of bondholders, compensation of officers, agents and employees of the authority, and the maintenance and operation of the buildings and facilities.

The rental payments and other charges due and owing to the authority from the lessees shall be transferred to it by the state treasurer. The legislature shall appropriate suffi-

cient moneys to the institutions of higher learning or agencies or departments to cover the rental payments.

▮ Although the authority is designated as a "body politic and corporate," it is actually an agency of the state created to finance the construction of certain public buildings, and which must even consult the state finance committee before issuing bonds. It is composed of three state officials whose primary concern is the state's welfare. The authority does not deal at arm's length with the various state agencies to which it leases buildings which it has constructed under the financial plan herein being considered. Their relationship is not the ordinary landlord and tenant relationship.

It is significant that the bonds shall mature in thirty years and that the leases shall run thirty years. There is no provision in the act for re-leasing. When a series of buildings will have been leased for thirty years and the principal and interest of the bonds sold to finance their construction will have been paid in full, the authority's responsibility for, and interest in, that particular project, will have been completed. The authority is not in business to make money.

It is contended that this is actually a leasing arrangement rather than the purchase of capital improvements to be paid by installments, because the act provides for the purchase by any institution of higher learning or agency or department when sufficient funds are available. Of course, such purchase could not be made until the bonds are paid in full, which would be at the expiration of the term of the lease, because the rental payments are pledged as security to the bondholders. No provision is made as to the amount of the purchase price. It is inconceivable that, after paying the rentals hereinbefore described for thirty years, the agencies would then pay the true value as a purchase price for the properties, rather than merely a nominal sum. In fact, they will have already paid for their individual buildings. We mention the institutions of higher learning and agencies or departments of government. It is actually the state which is paying the rentals. It is actually the state which is at-

tempting to use this means of acquiring buildings for its own use.

Contention is made that the rental money will come from special funds holding money from tuitions, capital grants, etc. It is true that a portion of the rentals will come from such sources. However, the far greater portion will arise from a general levy. Furthermore, it is the duty of the authority to pledge to the bondholders *all* or *any* of its revenues, rentals, or receipts from *all or any projects or properties.* In order to secure the bondholders, money from general taxation is to be commingled indiscriminately with money from special funds to such an extent that they will all lose their identity. As far as the bondholders are concerned, it is all revenue.

In *State Office Bldg. Comm. v. Trujillo,* 46 N. M. 29, 120 P. (2d) 434, in discussing the special fund doctrine, the court said:

"If we go back of the rentals to be paid by the State Board of Barber Examiners and other agencies to seek out where the moneys are to be obtained by the agencies for the purpose of paying such rentals and thereby to determine if the moneys to be so obtained may constitute a special fund or funds for the purpose of paying off and discharging the debentures, then there is this further difference between the Connelly and the present cases: Under the Connelly case it was specifically required that the moneys to be raised for payment of the debentures referred to therein were to be obtained from excise tax *and in no other way,* whereas in the instant case nothing whatever is said as to how the funds are to be raised to supply the agencies with money to pay the rentals. It is not specified in the Act that such moneys to be raised for payment of rentals *shall* come out of excise taxes or from any source aside or apart from general taxation. It is suggested in argument that the various agencies named in the Act, or some of them, will or do obtain moneys from excise taxes, fees, etc., out of which they could pay the rentals; but the Act does not *direct or require* that such rentals shall be paid from such sources. As we have pointed out, before a special fund scheme may prevail it is necessary that the sources for payment of the financial obligation be set out in the *creation* of the obligation in order to clearly disclose that no part of the obligation is

to be paid or satisfied from general taxation. Absent such a showing in this case, it is inevitable that to pay off the rentals a resort to general taxation is or may be necessary; and, therefore, the special fund doctrine cannot here obtain. This feature of the doctrine is well expressed under the quotation above set out taken from the case of *Brash v. State Tuberculosis Board, supra* [124 Fla. 652, 169 So. 218], which we requote to this extent: 'And, in the case of enterprises authorized by the Legislature to be embarked upon through state agencies, a particular scheme of financing will be held to be valid only where it is clearly demonstrable from the specific terms of the financing proposal itself that no tax burden or pecuniary liability of the state to appropriate or pay for the indebtedness about to be incurred will ever arise, or be looked to as security, in whole or in part, for repayment of the borrowed moneys.' "

We recognize the housing problem with which the state is confronted. Nevertheless, we can not permit the exigency of the situation to override the constitutional safeguard against improvidence and the integrity of the state's economy. We can not resort to dexterity of judicial thinking in order to assist the state in its problem. We can not close our eyes to what is actually being attempted. When we strip the plan down to fundamentals, we find that it is not a leasing arrangement between landlord and tenant, but the installment purchase by the state of certain buildings and facilities with state moneys raised by taxation, far in excess of the constitutional limitation.

The application for the writ of mandate is denied.

HAMLEY, C. J., HILL, DONWORTH, WEAVER, ROSELLINI, and OTT, JJ., concur.

MALLERY and FINLEY, JJ., dissent.

---

December 20, 1955. Petition for rehearing denied.