Ross L. **BACHTELL** and Samuel O. Christenson et al., Appellants,

v.

**CITY OF WATERLOO,** Iowa, et al., Appellees.

No. 138.

Supreme Court of Iowa.

Sept. 19, 1972.

Beecher, Beecher, Holmes & Rathert, Waterloo, for appellants.

· Clark & Butler, Keith, Gallagher, Lybbert & Martin and L. D. Lybbert, City Atty., Waterloo, for appellees.

HARRIS, Justice.

This action was brought to test the legality of an arrangement for the construction and use of a civic center in the City of Waterloo. The trial court held the plan valid. Although we sympathize with the lofty public purpose of the enterprise we are compelled to conclude the plan to be illegal. We reverse.

Section 378A.3, The Code, authorizes cities under certain conditions "to lease from any nonprofit corporation * * * and operate a building or complex of buildings as a civic center * * *."

To this end defendant Cedar Skyline Corporation hereafter called Cedar Skyline was organized. It is a nonprofit corporation whose sole purpose is to "acquire (by lease, purchase or otherwise) real estate, * * * construct · or otherwise obtain buildings, structures or improvements on the Site which may be utilized by the City or any department or agency thereof as a civic center; to acquire * * * and install * * * equipment * * * and to lease or sell the Civic Center to the City * * *."

After describing various corporate functions toward this end the amended articles declare "(u)pon the dissolution or final liquidation of the corporation, all of the properties and assets of the corporation which may remain after payment of all of its indebtedness shall vest in and be transferred to the City of Waterloo, Iowa, without consideration."

An undertaking somewhat tenuously denominated a "lease" was negotiated between Cedar Skyline and the defendant city. It was subsequently approved by slightly less than 60 percent of Waterloo voters voting in a special election. Cedar Skyline agreed to erect a civic center of prescribed proportions and "lease" it to Waterloo for 25 years at an annual rent of $367,500. The total rental payments would exceed $9,000,000 which, added to Waterloo's currently outstanding indebtedness, would exceed five percent of the value of the city's taxable property.

The plan is challenged on a number of grounds. It is necessary to consider only the first. The question presented is well

described at 56 Am.Jur.2d, Municipal Corporations, Etc., section 665, page 712:

"An ingenious plan of financing has been evolved to enable municipalities or counties which have reached the limit of indebtedness permitted by constitution or statute to acquire public buildings or utilities without pledging their credit therefor beyond the constitutional or statutory limit. Although this scheme varies in its application, its characteristic features are the leasing of property to a municipality or county for a certain period, in consideration of a periodical rental which does not exceed the debt limit, with an option to purchase the property at a certain price. The underlying theory of this plan is that the only 'indebtedness' or 'liability' assumed by the municipality or other public body is its agreement to pay rent, and that it is assured of the opportunity of acquiring ownership of the property if and when its financial condition will permit, and in the meantime to have the use of the property. * * *

"Where a so-called lease is, in fact, intended as a lease, and the rentals are in fact such, rather than payments on the purchase price, the courts, without exception, hold that such a lease of property by a municipality or county, with an option to purchase the same at a fixed price *in addition to the rentals,* does not create an indebtedness or liability within the meaning of a constitutional or statutory limitation of indebtedness. Some of the cases have reached this conclusion even where the rentals paid are to be applied or credited on the amount of the purchase price in the event the public body elects to exercise the option to purchase. In a few instances it has been applied even though the rentals were sufficient to cover the entire purchase price without the payment of any further sum. *On the other hand, where the rentals are in fact installment payments on the purchase price, the transaction clearly should be treated as a purchase, rather than a lease, and is not entitled to the protection accorded bona fide rentals* payable periodically, which do not become due until earned, and which therefore do not constitute a present indebtedness in the aggregate. *A contract which, although denominated and purporting to be a lease with option to purchase, is in fact a contract of purchase by payments in installments, has usually been treated as a contract of purchase rather than as a lease. According to most of the courts, the fact that the so-called rentals are sufficient, if paid throughout the term of the lease, to cover the entire purchase price, and to enable the municipality or county to acquire the property without further payment, renders the contract one of purchase rather than lease, and gives rise to an indebtedness, within the meaning of a constitutional or statutory debt limitation."* (emphasis supplied)

This appeal presents a case of first impression in Iowa. The debt limitation provision appearing in the Iowa Constitution is quite typical. Article XI, section 3 of the Iowa Constitution prohibits political subdivisions from incurring indebtedness exceeding five percent of the value of their taxable property. A number of cases in point interpret debt limitation provisions in other states. Not uncommonly, proposals for laudable, often essential, public improvements run afoul such limitations. The limitations are quite universally criticized as being unrealistically low. The cases are in conflict only as to whether the courts should respond to the difficult position of the political subdivisions.

A line of cases hold so-called "leaseback" arrangements invalid. Phoenix v. Phoenix Civic Auditorium & Convention Center Assoc., Inc., 99 Ariz. 270, 408 P.2d 818; State ex rel. Washington State Building Financing Authority v. Yelle, 47 Wash.2d 705, 289 P.2d 355; McCutcheon v. State Building Authority, 13 N.J. 46, 97 A.2d 663; Opinion of the Justices, 146 Me. 183, 79 A.2d 753; People ex rel. Adamowski v. Public Building Commission of Chicago, 11 Ill.2d 125, 142 N.E.2d 67; Deti v. City of Durango, 136 Colo. 272, 316 P.2d

579; State ex rel. Nevada Building Authority v. Hancock, 86 Nev. 310, 468 P.2d 333; McKinley v. Alamogordo Municipal School Dist. Auth., 81 N.M. 196, 465 P.2d 79; State ex rel. Hall v. Taylor, 178 S.E. 2d 48 (W.Va.1970).

Another category of cases can be found which accommodate the political subdivisions in avoiding the effects of the debt limitation provisions. Dean v. Kuchel, 35 Cal.2d 444, 218 P.2d 521; 405 Monroe Co. v. City of Asbury Park, 40 N.J. 457, 193 A.2d 115; Kelly v. Earle, 325 Pa. 337, 190 A. 140; Greenhalgh v. Woolworth, 361 Pa. 543, 64 A.2d 659; Application of Oklahoma Capital Improvement Auth., 355 P.2d 1028 (Okl.1960); Heberer v. Board of County Commissioners of Chaffee Co., 88 Colo. 159, 293 P. 349; Jefferson School Township v. Jefferson Township School Building Co., 212 Ind. 542, 10 N.E.2d 608; Hall v. City of Baltimore, 252 Md. 416, 250 A.2d 233; McFarland v. Barron, 83 S.D. 639, 164 N.W.2d 607; Book v. State Office Building Comm., 238 Ind. 120, 149 N. E.2d 273; Holster v. Board of Trustees of Passaic Co. College, 59 N.J. 60, 279 A.2d 798; Petition of Board of Public Buildings v. Crowe, 363 S.W.2d 598 (Mo.1962). Few of these cases are of comfort to defendants here, standing only for familiar principles not involved in this appeal. For example, in Application of Oklahoma Capital Improvement Authority, supra, the bonds were expressly declared not to be a debt of the State or of the Authority, because they were payable solely from the rents and revenues from the buildings. Often the plans were upheld by finding no present indebtedness for ensuing years rentals was created thereby. We are convinced such a present indebtedness was created for Waterloo in the plan. Waterloo has undertaken a direct annual tax sufficient to pay the annual installments. We cannot be dissuaded by the reservation in the lease for adjustments in the rental amounts whenever and to whatever extent Waterloo might be denied possession of the center.

■ Defendants strenuously argue the arrangement to be a bona fide lease. If such a claim could be established the arrangement could claim, in addition to all the forgoing, the protection of section 378A.9, The Code, which provides: " * * * neither such special annual tax nor said lease nor the rental payments required to be made thereunder nor any obligations incurred by the lessor nonprofit corporation shall be in any manner whatsoever a general obligation of such city or an indebtedness of such city within the meaning of any statutory or constitutional debt limitation." But this statutory escape is available only as an exception in the case of a bona fide lease. It is not available or intended as an exception from the constitutional debt limitation provisions in the case of the outright purchase of a public improvement by a political subdivision.

■ A careful study of the so-called "lease" considered together with the amended articles of incorporation of Cedar Skyline reveal a transparent purchase and sale of the civic center. The arrangement is not a lease, notwithstanding its self denomination as such. Accordingly the plan must be disapproved.

We acknowledge considerable regret in disapproving the plan. Manifestly its implementation would be of great benefit to the citizens of Waterloo. But, having found the "lease" to be a plain scheme for Waterloo to obtain rather than merely rent the improvement, we bow to the constitutional debt limitation. We note the admonition in a thoughtful article appearing at 25 Geo.Wash.L.Rev. 377, 396:

"As long as constitutional debt limitations exist in their present form, devices such as lease-financing will be proposed to evade them, especially as the limitations become overly conservative in relation to changing economic climates. The basic problem of constitutional revision can only be met head-on if judges are willing to continue to frustrate lease-financing

schemes no matter how attractive and essential the improvements they make possible. The voters will take care of the rest. As has rightly been said, the best way to insure repeal of a bad law is to enforce it strictly."

The judgment of the trial court must be and is

Reversed.

All Justices concur, except RAWLINGS, LeGRAND and McCORMICK, JJ., who dissent.