Argued on petition of Roger Martin April 29. Oregon Building Authority
Act held unconstitutional and proposed leases thereunder held invalid
September 8, 1976

In the Matter of the Constitutionality of Chapter 280,
Oregon Laws 1975

MARTIN, *Petitioner,*
*v.*
OREGON BUILDING AUTHORITY et al,
*Respondents.*

554 P2d 126

*John R. Faust, Jr.,* of Hardy, Buttler, McEwen, Weiss & Newman, Portland, argued the cause and filed briefs for petitioner.

*W. Michael Gillette,* Solicitor General, Salem, argued the cause for respondents. With him on the briefs were Lee Johnson, Attorney General, and Al J. Laue and Catherine Allan, Assistant Attorneys General, Salem.

HOLMAN, J.

## HOLMAN, J.

This is an original proceeding to test the constitutionality of the Oregon Building Authority Act (ORS 276.800-276.890) and proposed action of the Authority thereunder. Exclusive jurisdiction to determine the constitutionality of the Act and actions taken pursuant thereto is vested in the Supreme Court by ORS 276.890.

The Oregon Building Authority Act is a product of the 1975 Legislative Assembly. The Oregon Building Authority is created as "an independent public body politic and corporate,"[1] with certain enumerated corporate attributes and powers[2] and a Board of Directors comprised of the State Treasurer, the Attorney General and the Director of the Department of General Services.[3] The purpose of the Authority is "to assist in the coordinated development of necessary facilities [for the state] at a cost significantly lower than would be otherwise available."[4] It is empowered to issue notes and bonds to finance the acquisition of property and the construction of buildings and improvements.[5] Any facilities so constructed can be sold or leased to any state body.[6] The bonds issued to finance any such projects are to be payable solely from the revenues, funds or assets of the authority pledged therefor and shall not "constitute a debt or liability of the state within the meaning of any constitutional or statutory

---

[1] ORS 276.815.

[2] ORS 276.825.

[3] ORS 276.820(1).

[4] ORS 276.810(1)(d).

[5] ORS 276.825(12); ORS 276.840(1)(a). The power to issue notes and bonds is subject to the condition that the Joint Ways and Means Committee, and the Emergency Board during the interim, "has reviewed the proposed buildings to be financed by a bond issue and the proposed method of financing such buildings." ORS 276.840(1)(a).

[6] ORS 276.825(16). In the event that bond proceeds are used to make improvements on structures already owned by the state, with legislative approval the state is authorized to transfer title to the structure to the Authority. ORS 276.850(1).

limitation."[7] Any resolution authorizing issuance of bonds must provide for creation of a special trust fund, administered by an independent trustee, obligating the Authority to pledge its revenues and assets as security for payment of the bonds.[8] Bonds issued pursuant to the Act must mature within 20 years of their date of issue.[9]

Pursuant to the authority granted by the Act, the Board of Directors convened and adopted two resolutions authorizing the issuance of $32 million in revenue bonds to acquire and construct several facilities[10] and approving various proposals for the leasing of the projects to the state. Three different lease plans were considered, with the Board adopting different plans for different projects. The leases provide, in pertinent part, as follows: The rent due is to equal the amount of principal, interest and premium (if any) on the bonds, plus an amount sufficient to cover the Authority's operating expenses. All rentals and the right to enforce the agreement with respect to rental collections are to be assigned by the Authority to the trustees for the benefit of the bondholders. The assignment pledges the rentals as security for payment of the bonds. Until retirement of the bonds the obligation of the state to make rental payments to the trustee is unconditional as long as the premises are available for occupancy (under Plan 1 even if the premises are not available for occupancy), and the obligation is supported by the state's full faith and

---

[7] ORS 276.840(1)(d).

[8] ORS 276.840(3).

[9] ORS 276.840(2).

[10] The contemplated projects and their approximate cost include (1) construction of the Capitol wings ($10,500,000); (2) acquisition and construction of a general office building in Salem ($10,000,000); (3) acquisition and construction of a branch office building in Medford ($2,500,000); (4) renovation of and additions to the Public Service Building in Salem ($2,700,000); (5) acquisition of the Office Building presently leased by the state in Roseburg ($1,350,000); (6) acquisition of the Office Building presently leased by the state in Corvallis ($1,500,000); (7) refinancing with respect to certain loans on the Labor & Industries Building and the Agriculture Building in Salem ($2,800,000).

credit.[11] Upon payment of the bonds (which are payable over 20 years) the property, under Plan 1, is to be conveyed to the state without charge; under Plans 2 and 3 the state has the option to purchase the property for $1,000, and covenants to do so.

The question presented in this proceeding is whether the Act and the leases proposed pursuant thereto violate the proscription of Article XI, section 7, of the Oregon Constitution, which prohibits the legislature from creating "debts or liabilities" which, with certain exceptions, exceed in the aggregate $50,000. Article XI, section 7, states:

"Credit of State not to be loaned—limitation upon power of contracting debts. The Legislative Assembly shall not lend the credit of the state nor in any manner create any debt or liabilities which shall singly or in the aggregate with previous debts or liabilities exceed the sum of fifty thousand dollars, except in case of war or to repel invasion or suppress insurrection or to build and maintain permanent roads; and the Legislative Assembly shall not lend the credit of the state nor in any manner create any debts or liabilities to build and maintain permanent roads which shall singly or in the aggregate with previous debts or liabilities incurred for that purpose exceed one percent of the true cash value of all the property of the state taxed on an ad valorem basis; and every contract of indebtedness entered into or assumed by or on behalf of the state in violation of the provisions of this section shall be void and of no effect.

---

[11] "*Obligation of Department Unconditional.* The obligation of the State to make payments with respect to the Bonds * * * and to pay all other amounts provided for in this Agreement and to maintain the Project * * * shall be absolute and unconditional, irrespective of any defense or right of set-off, recoupment or counterclaim it might otherwise have against the Authority. The Department will not suspend or discontinue any such payment or terminate this Agreement (other than in the manner provided for hereunder) for any cause including, without limiting the generality of the foregoing, any acts or circumstances that may constitute a change in the tax or other laws of the United States, the State or any political subdivision of either thereof, or any failure of the Authority to perform and observe any agreement or covenant, whether expressed or implied, or any duty, liability or obligation arising out of or connected with this Agreement. * * *." Sec. 4.6 of lease between Department of General Services and the Authority.

This section does not apply to any agreement entered into pursuant to law by the state or any agency thereof for the lease of real property to the state or agency for any period not exceeding 20 years and for a public purpose."

Most state constitutions contain some sort of limitation on the power of the legislature to create debts in excess of a certain monetary sum.[12] The constitutional provisions were primarily a response to the heavy borrowing engaged in by many states prior to 1840. Bond proceeds were utilized to finance internal improvements such as canals, railroads and turnpikes, and the enlargement of banking facilities, to open up markets and to stimulate commerce. Following the depression of 1837, many states defaulted on their obligations during the early 1840's. These embarrassments led to taxpayer disenchantment and ultimately to the adoption of constitutional provisions designed to curb the legislature's ability to subject tax funds to long-term obligations and debt servicing. States entering the Union in subsequent years invariably included such a limitation in their constitutions.[13] About 30 years later, during the 1870's, many states also began limiting by constitutional provisions the ability of local government entities—which had gone deeply into debt primarily to finance the railroad expansion—to incur debts.[14] The Oregon Constitution contains provisions limiting the power of cities and counties to lend their credit.[15]

---

[12] Apparently there are only eight states in which the borrowing power of the legislature is not restricted in some way. In the remaining states the limitations take various forms. In some states the monetary limit is a fixed sum, whereas in others it is a certain percentage of assessed valuation. Borrowing in excess of the constitutional ceiling can be authorized by referendum in some states but requires a constitutional amendment in others. A. James Heins, Constitutional Restrictions Against State Debt 9-12, 29 (1962).

[13] For a general history of constitutional debt limitations, see *id.* at 3-9.

[14] Magnusson, *Lease-Financing by Municipal Corporations as a Way Around Debt Limitations,* 25 Geo Wash L Rev 377, 381-82 (1957).

[15] Oregon Constitution, Art XI, §§ 9-10.

It is generally agreed that in imposing debt limitations, "the predominant purpose was the achievement of a high degree of control over debt creation in order to forestall irresponsibly imposed tax burdens * * *."[16] The Oregon cases have stated that our provision "was adopted by the people as a protection against burdensome and excessive taxation"[17] and that it was intended "to prevent exposing the sources of public revenue to potential hazard."[18] Long-term obligations create a fixed charge against future revenues and can impair the flexibility of planning and the ability of future legislatures to avoid a tax increase. Debt restrictions force the elected representatives of the people to operate the government within its means and remove the temptation to undertake projects on an enjoy-now, pay-later basis.

Several devices have been conceived to skirt debt restrictions. However, they do not enjoy unanimity of approval. Without doubt the most controversial of all attempts to evade debt ceilings is the public building authority device at issue here. It has been tried in many states and it appears that a clear, but by no means decisive, majority of the cases have upheld it.

The most accurate characterization of the effect of the public building authority device is that it divorces the borrowing function from the paying function in what is essentially one integral transaction. That is, the borrowing power is located in one entity (the Authority) while the money for retiring the debt comes from another (the state). Upholding the device requires a finding that neither the bonds floated by the Authority nor the lease entered into by the state violates the constitutional provision. We must first decide whether the bonds issued by the Authority are

---

[16] Bowmar, *The Anachronism Called Debt Limitation,* 52 Iowa L Rev 863, 873 (1967).

[17] *McClain v. Regents of the University,* 124 Or 629, 634, 265 P 412 (1928).

[18] *Carruthers v. Port of Astoria,* 249 Or 329, 337, 438 P2d 725 (1968).

to be considered debts of the state within the meaning of the Constitution. This requires an analysis of the role of the Authority in the contemplated transactions. The question, in essence, is whether the interposition of the Authority between the state and the lenders sufficiently isolates the state from the debt so as not to contravene the constitutional limitation.

There are two avenues which courts have followed to arrive at a conclusion that bonds issued by an authority of a state are not debts of the state within the constitutional provision. First, in many states the authority is chartered as a public corporation, with traditional corporate attributes and powers. Since a public corporation is often considered an entity separate from and independent of the state, rather than a state agency, a court can choose to respect the corporate form of the authority and thereby conclude that the obligations of the authority are not debts of the state.[19] Second, even if the authority is considered to be in substance a state agency, the bonds have been upheld on the theory that they are revenue bonds.[20]

The Authority in the instant case makes no contention that the bonds in question here are exempt from the constitutional limitation because they are revenue bonds. We deem it desirable, however, to review the reasoning supporting approval of revenue bond financing to demonstrate why the exemption would not be available in any event. Approval of revenue bonds is based upon the principle that the constitutional

____

[19] *See, e.g., Berger v. Howlett,* 25 Ill2d 128, 182 NE2d 673, 676 (1962); *Book v. State Office Bldg. Comm.,* 238 Ind 120, 149 NE2d 273, 281-82 (1958); *State ex rel Fatzer v. Armory Board,* 174 Kan 369, 256 P2d 143, 151-52 (1953); *Walinske v. Detroit—Wayne Joint Bldg. Authority,* 325 Mich 562, 39 NW2d 73, 81 (1949); *Kelley v. Earle,* 325 Pa 337, 190 A 140, 147 (1937); *State ex rel Thomson v. Giessel,* 271 Wis 15, 72 NW2d 577, 585 (1955).

[20] *See, e.g., Holmes v. Cheney,* 234 Ark 503, 352 SW2d 943 (1962); *Book v. State Office Bldg. Comm.,* 238 Ind 120, 149 NE2d 273, 282-83 (1958); *State ex rel Fatzer v. Armory Board,* 174 Kan 369, 256 P2d 143, 150-51 (1953); *Preston v. Clements,* 313 Ky 479, 232 SW2d 85, 90 (1950); Application of Oklahoma Capital Improvement Authority, 355 P2d 1028, 1032 (Okla 1960).

restriction prohibits only the pledging of the state's full faith and credit, *i.e.,* general tax revenues. Revenue bonds provide that the bondholders can look for payment only to the revenue generated by the project financed by the bonds. The financed project usually resembles a commercial enterprise, and bond payments are limited to the fund created by the charges paid by third parties who are the users of the project. The state in effect merely acts as a conduit between the users and the bondholders; no threat is posed to the tax coffers since general tax revenues are not subject to bondholder claims.

*McClain v. Regents of the University,* 124 Or 629, 265 P 412 (1928), involving dormitory construction, is the initial Oregon case upholding such an arrangement, and the doctrine has supported the financing of many other projects.[21] However, where, as here, the revenue for bond payment comes from the general fund of the state and is not generated from charges by the state to third parties for facilities or services, the rationale exempting revenue bonds from the constitutional restriction is obviously inapplicable. The state no longer acts as a conduit, but rather it has directly obligated general tax revenues to sustain the fund for bond payment.

The Authority therefore relies on its position that it is an entity distinct from the state and its debts are therefore not those of the state. Petitioner, on the other hand, argues that this case is controlled by *McClain* wherein it was held that the Board of Regents was not an independent legal entity but an agency of the state. It was therein argued that since the "Regents of the University" was a distinct and independent corporate entity, its debts were not those of the state. The court, however, concluded that "the

---

[21] *Walsh Construction Co. v. Smith,* 272 Or 398, 537 P2d 542 (1975) (low-income housing); *Miles v. City of Eugene,* 252 Or 528, 451 P2d 59 (1969) (power plant); *Carruthers v. Port of Astoria,* 249 Or 329, 438 P2d 725 (1968) (industrial port facilities); *Morris v. City of Salem et al,* 179 Or 666, 174 P2d 192 (1946) (parking meters).

'Regents of the University' is not an independent legal entity and is merely an administrative agency vested by the legislature with certain corporate powers to carry out the educational policy of the state * * *." 124 Or at 633. In the present situation the Authority possesses many of the characteristics considered determinative by the court in *McClain*. It is managed and controlled by state officers, it must report periodically to the Governor and must obtain legislative approval for certain of its actions, and it is maintained largely by public funds. Its sole purpose is to implement the building policies of the state. There are differences, however, the most important of which is the clear expression of the legislature that the Authority is intended to be an "independent body." ORS 276.815.

Some courts have struck down the building authority device partly on the ground that the ostensibly independent entity is really an agency of the state.[22] We do not feel compelled to base our decision on this distinction, however, for we have concluded that, viewing the transactions as a whole, the existence of the Authority must be disregarded if we are to remain faithful to the purpose of the constitutional debt limitation.

No one can seriously argue that the Authority has any purpose other than to serve the state in a manner in which the state is prohibited from serving itself. There is no independent business justification for its existence aside from its ability to borrow money. The Authority itself has no use for the structures which it finances. The specialized features and location of its buildings preclude in most instances a commercial market for their space, and leave the state as its only possible tenant. The responsibility for handling construction of the Authority's projects is delegated to the state under the leases. The Authority does not manage its income since all rentals are assigned to the trustees

---

[22] *See, e.g., State ex rel Nevada Bldg. Authority v. Hancock,* 86 Nev 310, 468 P2d 333, 336 (1970); *State ex rel Washington State Bldg. Financing Authority v. Yelle,* 47 Wash2d 705, 289 P2d 355, 360 (1955).

as security for payment of the bonds. The Authority's only function is to effectuate the creditor-debtor relationship which exists in fact between the bondholders and the state, the state being the sole source of funds. It is a gutless intermediary whose sole reason for existence is to insulate the state from the constitutional debt limitation. As has been so pungently stated, "It is a scheme which would fool only a lawyer."

The Authority's lack of any real substance has been noted by the commentators. It has caused one writer to speak very favorably of the reasoning of an early Maine case, *Reynolds v. City of Waterville,* 92 Me 292, 42 A 553 (1898), which invalidated the arrangement on the ground that it was only a form of mortgage. He states:

> "* * * [B]uilding authorities and mortgage trustees have many common characteristics. Both are jural personalities separate from the lenders and the ultimate enjoyer of the *res,* and both have duties which spring from documents purporting to give them title to the *res.* Neither, however, has a proprietary interest in the property nor a proprietor's right to its possession. Like the typical trustee under a corporate bond indenture, the building authority, although the primary recipient of payments from the ultimate user, acts only as a conduit of funds between the user and the bondholders." (Footnote omitted.)[23]

The stripping away of the formal paraphernalia that clothe the Authority and the transactions leads us to believe that a debt of the state is created within the meaning of the constitutional provision. Regardless of how the status of the Authority as a legal entity is viewed, its presence should be disregarded because its sole function is a mechanical one to effectuate a connection between the bondholders and the state in a manner which defeats the purpose of the debt limita-

---

[23]Morris, Jr., *Evading Debt Limitations with Public Building Authorities: The Costly Subversion of State Constitutions,* 68 Yale L J 234, 245 (1958).

tion. To view the Authority as independent would be a victory of form over substance. The relationship in fact is one between the bondholders and the state; and the state's role in the arrangement goes beyond simply leasing the property from the Authority, for it is, in essence, retiring a debt which has been incurred on its behalf and which it has the sole responsibility to repay.[24]

Our conclusion may be subject to the criticism that we have disregarded legal forms. However, this is the case anytime a court pierces form to arrive at the substance of an artifice. The use of the authority device contravenes the purpose of the constitutional debt limitation. If approved, there would no longer be any effective limitation. Use of the authority permits the discretionary incurrence of long-term obligations, which the state is in substance obligated to repay from general tax revenues, without limit and without control by the voters. A similar approach was taken by the Supreme Judicial Court of Massachusetts in *Ayer v. Commissioner of Administration,* 340 Mass 586, 165 NE2d 885 (1960). Without attempting to characterize the authority as a state agency or even the lease as a purchase agreement, it struck down the transaction as

---

[24] "It follows, then, that, * * * the building authority device creates a debt in the constitutional sense. The authority and the leasing government are functionally so integrated that to construe the authority as an independent body is to mistake form for substance. Not only does the government require the project for its functions, but that part of the rent which amortizes the debt also becomes a pledge securing the government's future performance. To protect this pledge and continue its functions, the government * * * cannot terminate the long-term contracts * * *. To fulfill its obligations to its bondholders, the authority is similarly inhibited, unless the lessee-government is behind in its rent. In fact, the authority's power to terminate the lease, rather than indicating that no debt is involved, proves that the rent obligation is actually a debt, since by the exercise of this power the authority can coerce payment. * * * [The] analogy to a deed of trust in the nature of a mortgage is singularly apposite. The trustee's strict duties owed the lenders limit his function and reduce him to a contractual device. The authority's duties to the bondholders similarly color the entire building authority device and convert the 'rents' into 'debts.' " (Footnote omitted.) *Id.* at 262-63.

a whole because it so obviously contravened the constitution. The court said at various points:

> "We agree that the Association is a separate entity. It can contract and issue bonds. It can sue and be sued. But these attributes are not enough to meet the present constitutional challenge. This is because we think that, viewing the project as a whole, the Association is nothing more than a mere intermediary to carry out only one purpose.
>
> "* * * * *.
>
> "The statute and the 'contract of lease' which it permits, when scrutinized together, have all the earmarks of a State operation. * * *.
>
> "* * * * *.
>
> "* * * We hold that the creation of the Association to execute the 'contract of lease' is merely one phase of an integrated plan of which the substantial result is constitutional evasion. * * *."[25]

For another holding that in a similar situation the bonds constitute a debt of the state, see *State ex rel Public Institutional Building Authority v. Griffith,* 135 Ohio St 604, 22 NE2d 200 (1939).

■ The state lays special emphasis upon its claim that the state's obligation is that of a lessee and that the indebtedness comes within an exception in the constitutional provision that

> "This section does not apply to any agreement entered into pursuant to law by the state or any agency thereof for the lease of real property to the state or agency for any period not exceeding 20 years and for a public service."

Our holding that for constitutional purposes we are going to look through the dummy corporation and that the bonds are the debts of the state is sufficient to invalidate the entire scheme. The bonds could not be the debts of the state and at the same time the state be an actual lessee. Assuming, however, only for the sake of argument, that for the purpose under consideration here the bonds are not an indebtedness of the state, the

---

[25] *Ayer v. Commissioner of Administration,* 340 Mass 586, 165 NE2d 885, 889, 892 (1960).

same result would ensue because the "lease" here constitutes an indebtedness of the state and is not the type of arrangement contemplated by the language of the exception.

The particular language in question was inserted in the constitutional provision by amendment as the result of a vote of the people on November 3, 1964. It was made necessary by this court's decision in *Brewster v. Deschutes County et al,* 137 Or 100, 1 P2d 607 (1931), in which we rejected the thesis that a long-term lease creates a debt for only the current rent installment rather than for the aggregate of the payments over the term of the lease. The court held that under Article XI, section 10, of the Constitution (the debt limitation applicable to counties) a lease of a courthouse from a private developer was invalid, stating that "in determining the amount of the debt or liability the aggregate sum and not the particular instalment is the decisive factor."[26] 137 Or at 106.

The Voters' Pamphlet for the General Election, November 3, 1964, contains the following statements relating to the lease measure:

"Explanation

"By Committee Designated Pursuant to ORS 254.210

"The Fifty-second Legislative Assembly has submitted to the people for approval or rejection an amendment to section 7, Article XI of the Constitution of the State of Oregon adding the following language:

" '. . . this section does not apply to any agreement entered into pursuant to law by the State or any agency thereof for the leasing of real property to the State or agency for any period not exceeding 20 years and for a public purpose.'

---

[26]The court relied primarily on *Salem Water Co. v. City of Salem,* 5 Or 29 (1873). That case involved an executory contract to furnish water for 17 years rather than a lease, but the principle stated there was held equally applicable to a long-term lease. The court there said:

"* * * The moment the contract was made it created a present obligation on the part of the city to pay money to the company at future periods." 5 Or at 32.

"Purpose

"Under present constitutional provisions, as interpreted by the Supreme Court of the State of Oregon and the Attorney General, the State of Oregon and its agencies may not lease real estate (office space or other) for its use for a period longer than the current biennium unless the total periodic rent to be paid by the State is less than $50,000.00. Passage of the proposed amendment would permit the leasing of real estate for periods not exceeding 20 years. This would enable the State of Oregon and its agencies to assume an improved negotiating position in the competitive market.

"RICHARD D. BARBER, Salem, Oregon
LEE V. OHMART, Salem, Oregon
ROBERT K. POWELL, Salem, Oregon

"Measure No. 2
"Leasing Property for State Use
"Argument in Favor
"Submitted by Legislative Committee provided by Subsection (3) of ORS 255.421

"The State of Oregon has had a continuing problem resulting from the fact that it cannot lease real property for a longer period than two years.

"It is common knowledge that people are not greatly interested in renting space to the State when the lease is only for a short period of time. The result of this has been the State frequently has been forced to build buildings when it would have been more sensible and economical to rent.

"It is our contention that if the State and its agencies were permitted to lease for a period longer than two years we would see our state services performed just as well in more economical quarters, and with the additional future benefit of having the leased property remain on the tax roles [sic] and pay its fair share of the costs of government.

"We believe the passage of this measure will result in substantial savings of taxpayers' money.

"SENATOR HARRY D. BOIVIN
REPRESENTATIVE STAFFORD HANSELL
REPRESENTATIVE ROSS MORGAN"

There was no argument against the measure.

[ 149 ]

Both the Voters' Pamphlet representations and the legislative history of the measure indicate that the lease exception was not intended to allow the state to engage in a lease-purchase arrangement. The "rent" payable under a lease-purchase agreement is not geared to the "competitive market," but rather is calculated to equal the incremental installment on the purchase price. There is no "additional future benefit of having the leased property remain on the tax roles [sic]" if the state ultimately acquires the property via the lease. In any event, the Act provides that the Authority's property is *tax-exempt.* ORS 276.860(2). The representations made to the voters thus indicate that the lease exception not only was not intended to allow lease-purchases, but also was not foreseen as authorizing the authority device of leasing used here.

The brief legislative history reveals that the issue of whether lease-purchase agreements were included within the amendment was raised in the Joint Ways and Means Committee when the Senate Joint Resolution which embodied the amendment to be submitted to the people was considered,[27] but no conclusion was reached either way nor was any provision inserted in the proposed language to indicate that lease-purchasing was permissible. Certainly the information given to the voters by means of the Voters' Pamphlet indicated to the contrary.

■ In contexts where it is necessary to determine whether an arrangement denominated a "lease" by the parties is actually a financed purchase, the prevailing rule is that the intention of the parties is to govern. Rules have been formulated for determining that intention. In tax cases the principles discussed are limited to leases of personal property, but there seem to be no factors which would weaken their persuasiveness where real property is involved. Federal Revenue Ruling 55-540, 1955—2 Cum. Bull. 39, 41-42, sets out

[27] Minutes, Ways & Means Committee Hearing on Senate Joint Resolution 19 (April 26, 1963).

the rules governing the determination whether a lease of equipment is to be treated for tax purposes as a purchase contract.[28] That ruling states in relevant part:

> "* * * Whether an agreement, which in form is a lease, is in substance a conditional sales contract depends upon the intent of the parties as evidenced by the provisions of the agreement, read in the light of the facts and circumstances existing at the time the agreement was executed. In ascertaining such intent no single test, or any special combination of tests, is absolutely determinative. * * * However, * * * it would appear that in the absence of compelling persuasive factors of contrary implication an intent warranting treatment of a transaction for tax purposes as a purchase and sale rather than as a lease or rental agreement may in general be said to exist if, for example, one or more of the following conditions are present:
>
> "* * * * *.
>
> "(b) The lessee will acquire title upon the payment of a stated amount of 'rentals' which under the contract he is required to make. * * *.
>
> "* * * * *.
>
> "(e) The property may be acquired under a purchase option at a price which is nominal in relation to the value of the property at the time when the option may be exercised, as determined at the time of entering into the original agreement, or which is a relatively small amount when compared with the total payments which are required to be made. * * *.
>
> "(f) Some portion of the periodic payments is specifically designated as interest or is otherwise readily recognizable as the equivalent of interest. * * *."

Under the Uniform Commercial Code it is sometimes necessary to determine whether a lease is "intended as security," *i.e.,* whether the lease is in

---

[28]The different tax treatment accorded to a "lease" and a "sale" may cause the parties to attempt to characterize their transaction as a lease to gain certain tax advantages. The rent payable under a lease is deductible as a current expense, whereas the property would be subject to the depreciation deduction over its useful life if the transaction were arranged as a sale.

[ 151 ]

reality a conditional sale with the "lessor" retaining title as security for performance of the buyer's obligations.[29] Section 1-201(37) of the UCC (ORS 71.2010(37)) states:

> " 'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation. * * * Whether a lease is intended as security is to be determined by the facts of each case; however, * * * (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security."

Evaluation of the proposed leases under these criteria would lead to a conclusion that the parties intend a purchase transaction rather than a bona fide lease. When the bonds are retired, under Plan 1 the Authority would convey the buildings to the state for nothing; under Plans 2 and 3 the state would have the option to purchase for $1,000, which can only be considered nominal in relation to total cost, and the probable worth when the option is exercised, of the project. It is specified that rent would be established in an amount sufficient to cover the interest and principal on the bonds, plus the operating expenses of the Authority, over 20 years. Assuming the premises are available for occupancy, the state is unconditionally obligated to pay rent to the trustee notwithstanding the acts of the Authority.

Moreover, the practical realities of the arrangement negate any possibility that the parties intend anything other than a financed purchase transaction. As one commentator has pointed out:

> "* * * It is generally believed that rather than a true renting, it is a borrowing, within the meaning of the

---

[29]The distinction is important because the holder of title under a true lease need not file a financing statement to protect his interest in, and right to, the property upon default or bankruptcy of the lessee. If the lease is actually an installment purchase, however, the "lessor" must file a financing statement to perfect his security interest in the property and insure priority over other creditors in the event of bankruptcy.

constitutional provisions, which takes place under these lease-financing techniques. In the usual case, the rental payments, though often expressly found to be 'fair and reasonable,' are not related to use or any market value. Rather, they are established so as to amortize the cost of the property in question. The amounts are usually just exactly enough to cover the authority's debt service plus some ancillary expenses. 'The only variation between these "rents" and debt service is the legal web woven around the transaction.' " (Footnote omitted.)[30]

Therefore, an honest assessment of the proposed "leases" demands a finding that they are in substance installment purchase agreements designed to finance the state's acquisition of the structures. A number of cases have so held and have invalidated similar arrangements on this ground.[31]

The Washington Court in *State ex rel Washington State Bldg. Financing Authority v. Yelle,* 47 Wash2d 705, 289 P2d 355, 361 (1955), focused on a similar arrangement as a whole, concluding as follows:

"We recognize the housing problems with which the state is confronted. Nevertheless, we can not permit the exigency of the situation to override the constitutional safeguard against improvidence and the integrity of the state's economy. We can not resort to dexterity of judicial thinking in order to assist the state in its problem. We can not close our eyes to what is actually being attempted. When we strip the plan down to fundamentals, we find that it is not a leasing arrangement between landlord and tenant, but the installment purchase by the state of certain buildings and facilities with state moneys raised by taxation, far in excess of the constitutional limitation."

---

[30] Bowmar, *The Anachronism Called Debt Limitation,* 52 Iowa L Rev 863, 889 (1967).

[31] *See, e.g., City of Phoenix v. Phoenix Civic Aud. & Con. Center Ass'n.,* 99 Ariz 270, 408 P2d 818, 829-30 (1965); *Bachtell v. City of Waterloo,* 200 NW2d 548, 551 (Iowa 1972); Opinion of the Justices, 146 Me 183, 79 A2d 753, 756 (1951); *McCutcheon v. State Bldg. Authority,* 13 NJ 46, 97 A2d 663, 668 (1953); *State ex rel Washington State Bldg. Financing Authority v. Yelle,* 47 Wash2d 705, 289 P2d 355, 360-61 (1955).

The cases which hold in similar situations that the so-called "lease" is in fact a true lease acknowledge the general rule that if the lease is in reality an installment purchase, the state is obligated for the entire amount of "rent" payments and the transaction is invalid as a credit device. They then move easily to the conclusion, however, that the arrangement is a true lease whenever one or more incidents of a bona fide lease are present, and hold that the existence of an option to purchase for a nominal consideration or of a provision for automatic conveyance to the state when the bonds are paid off, does not convert the arrangement to an installment purchase.[32]

The commentators have expressed great dissatisfaction with the logic and reasoning of these decisions. Although most writers do not favor the concept of debt limitations, they nevertheless are in agreement that the reasoning of the favorable cases cannot hold up when subjected to close and realistic assessment. One author has summed up the objection of the commentators as follows:

> "It seems apparent that lease-financing is actually borrowing by another name. To contend that the method of payment alters the fact of payment strains ratiocination. Unlike ordinary leases, these leases are in practice non-terminable, nor do the parties ever intend to terminate them. The amounts paid as 'rent' are not the use value of the property, as true rent would be, but equal debt amortization charges on the full cost of the facility financed. Moreover, securities analysts would probably treat these charges not as current expenses, which rent would be, but as repayment of a long term debt. Nor are these 'leases' aimed at temporary use, as in the ordinary lease, but at acquisition of title. The only variation between these 'rents' and debt service is in the legal web woven around the transaction.
>
> "* * * * *.

---

[32] *See, e.g., Dean v. Kuchel,* 35 Cal2d 444, 218 P2d 521, 523 (1950); *Book v. State Office Bldg. Comm.,* 238 Ind 120, 149 NE2d 273, 284-85 (1958); *Hall v. City of Baltimore,* 252 Md 416, 250 A2d 233, 240 (1969). The "general rule" on this subject is stated in Annot., 71 ALR 1318, 1326 (1931).

"* * * It seems clear that the intent behind debt limitations was to prevent long-term repayment obligations; *i.e.* borrowing for public improvements and to prevent the obligatory annual need for the resulting taxation to pay for the liability. And yet, by whatever name, this is the very effect of lease-financing." (Footnotes omitted.)[33]

This court takes no position whether the constitutional limitation is good or bad. This is a political question for the people of this state to decide. The present limitation in the Oregon Constitution cannot be completely nullified by a device such as that offered here and without a vote of the people.

Oregon Laws 1975, ch 280, the Oregon Building Authority Act, is held unconstitutional, and the purported leases entered into pursuant thereto are hereby held invalid as violative of the Oregon Constitution, Art. XI, § 7.

**O'CONNELL, J.,** specially concurring.

I concur in the result but I do not accept the majority's reasoning. The majority opinion rests upon two alternative grounds. The first ground assumes that even if the transaction between the state and the Building Authority has the characteristics of a lease rather than a sale, the arrangement is invalid because the Building Authority (a public corporation) is under the control of the state and is created solely for the purpose of accomplishing what the state itself cannot do, namely the pledging of the state's credit beyond the constitutional limit by the issuance of bonds, the money from which is then used to construct the buildings ostensibly leased to the state. The opinion "lifts the corporate veil" on the ground that the Building Authority is simply a "subterfuge" to circumvent the constitutional restriction.

It does not advance the analysis of the problem to

[33] Magnusson, *Lease-Financing by Municipal Corporations as a Way Around Debt Limitations,* 25 Geo Wash L Rev 377, 390-91 (1957).

say that the public corporation in this case is a "subterfuge," because all corporations are "subterfuges" in the sense that they are artificial "persons" recognized by the law so that real persons can accomplish ends they could not accomplish otherwise. The fact that a corporation is completely under the control of its creators does not vitiate the device. Thus, a subsidiary may be completely dominated by its parent corporation, and may exist simply as a bookkeeping device to minimize taxes or escape some other burden or disadvantage by interposing a separate "corporate veil." Yet the law respects the corporate form which is created.

It is obvious, then, that "control" of a corporation is not enough to warrant lifting the veil. The majority opinion reasons, however, that the veil must be lifted in the present case because the control is reserved for an invalid purpose, i.e., the over-pledging of the state's credit through the issuance of bonds. This, I believe, begs the constitutional question before us.

The transaction set up under the statute can, on one hand, be looked at as a device by which the state is indirectly issuing bonds and thus pledging the credit of the state; or, on the other hand, as a plan by which the state is leasing property from a corporation, the state having no obligation to pay anything to the bondholders; its only obligation being to pay rentals over a period of twenty years. Whether the arrangement is seen as the former or the latter of these devices would, it seems to me, depend upon whether the arrangement permitted under the statute makes it possible for the state to create an indebtedness under the lease greater than that contemplated by the constitutional amendment.

In Oregon we must begin with the fact that the people authorized the legislature to pledge the credit of the state over and above the $50,000 limitation to the extent of a promise to pay rent for a period not to exceed twenty years. The majority would agree that

this is a grant of power to the legislature to pledge the credit in an amount equal to twenty times the annual rental, however great that sum may be. If the legislature wished to rent buildings at a cost of one million dollars a year, it is free to do so under our constitution, although the effect would be, in theory, to pledge the credit of the state in the amount of $20,000,000. The limitations inherent in the use of a leasing device are where the majority must begin its analysis.

Quite apart from the Oregon Building Authority Act, the legislature would be authorized to enter into an agreement with an owner of land, let us say, a private corporation, by the terms of which the corporation would agree to issue bonds to raise money with which it would construct a building for the purpose of leasing it to the state for twenty years. A guarantee by the state to pay the rentals to the bondholders would not raise any additional constitutional problem because the constitutional provision authorizing leases up to twenty years assumes that the state is bound for the entire amount of the rental over the entire term of the lease.

If the same arrangement is made except that we substitute a public corporation for the private corporation, the same result should obtain (assuming, as the majority must in developing its first rationale, that the transaction is a lease within the meaning of the constitution). The central issue in this case is whether, irrespective of the corporate form, the lease arrangement authorized by the statute permits the state to evade the constitutional debt limitation.

Does the statute permit such an overpledging by the state? I believe that it does and therefore I concur in the opinion. The reason the constitutional limit can be exceeded by the statutory scheme is that the constitutional amendment was intended to relax the original $50,000 limitation only to the extent of permitting the state to obligate itself in an amount

which any one would be obligated to pay under a twenty year lease where the rental represents a fair approximation of the reasonable rental value of the property. The scheme devised under the statute does not hold the state within these bounds. The annual payments called for under the lease to the state have no necessary relationship to the reasonable rental value of the property leased. The annual rental payments represent a twentieth part of whatever amount it will cost to construct the building to be leased, an amount which, in the usual case, would represent a greater obligation of the state than the sum of the annual rentals.

Moreover, in a normal leasing arrangement, the lessee has the economic option of terminating an undesirable lease without extreme cost where the premises can be easily re-let. Practically speaking, this minimizes the economic risk of leases and is consistent with the constitutional exception of leases from the general debt limitation bar. Where, as here, the circumstances indicate that there is little chance of re-letting in the event of a default, entering the lease is inconsistent with the risk protection purposes of the constitutional provisions.